JSC NEFTEGAS–IMPEX, Appellant,

v.

CITIBANK, N.A., Appellee.

Citibank, N.A., Appellant,

v.

JSC Neftegas–Impex, Appellee.

No. 01–07–00397–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 10, 2011.

Lloyd R. Cunningham, Lori A. Swann, Cunningham Law Group, Houston, TX, for Appellant.

Aaron Keiter, Strother Keiter & Mulder, P.C., Andrew R. Harvin, Michael D. Schimek, Doyle, Reed, Restrepo, Harvin & Robbins, Christopher Benjamin Dove, James R. Leahy, Locke Lord Bissell & Liddell LLP, Brent Alan Benoit, Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices SHARP and TAFT.

## OPINION ON REHEARING

TIM TAFT,* Justice (Retired).

The Court's opinion and judgment in this case issued on April 16, 2010. JSC Neftegas–Impex ("JSCNI") moved for rehearing, and Citibank, N.A. ("Citibank") responded to that motion. After due consideration, the Court grants JSCNI's motion for rehearing, withdraws its opinion and judgment dated April 16, 2010, and issues today's opinion and judgment in their stead.

A jury rendered judgment in favor of JSCNI and against Transcontinental Products and Services, Inc. ("TPS") for fraud and breach of fiduciary duty. The jury also rendered judgment in favor of JSCNI and against Citibank for fraud, knowing participation in TPS's breach of fiduciary duty, and conspiracy. The jury awarded actual damages against both defendants and exemplary damages against Citibank. The trial court granted in part Citibank's motion for judgment non obstante verdicto ("JNOV"), rendering a take-nothing judgment on the claims for knowing participation in TPS's breach of fiduciary duty and conspiracy and the award of exemplary damages. Both JSCNI and Citibank appeal. We modify the judgment and affirm it as modified.

## BACKGROUND

OAO Neftegas ("Old Neftegas") was founded in 1991 by Leonard Rafikov, its president, an experienced business person who had been the director of Cbnefteprovd and the First Deputy Prime Minister of the Oil Industry of the former Soviet Union. Over the course of the events relevant to this suit, Old Neftegas went bankrupt and assigned certain of its rights and

liabilities to ZAO Neftegas ("New Neftegas"). In 1997, New Neftegas entered into a joint venture with TPS and another company as part of a later phase of a refinery project ("the Project"). This joint venture was JSCNI, the only of the Neftegas entities that is a party to this appeal. Nikolai Kashuro was the Director of Economy and Finance for Old and New Neftegas.

TPS, a Houston-based company, was interested in doing business by facilitating projects in Russia. Its co-owners were Irfan Abji, its president and a former loan executive with Citibank; Peter Karber, its executive vice-president; and Manuel Santos, who, along with his family, were important clients of Citibank. Karber and Abji met Edward Sartan, a Russian-born American who had been working in Russia, who would later become TPS's consultant and an interpreter and translator for the Neftegas entities for the project described below. Sartan introduced Abji and Karber to Rafikov.

The Project involved the development of mini-refineries in Siberia, Russia, something that Old Neftegas desired. Rafikov proposed the Project to TPS. TPS introduced Rafikov to John Kermath, a Citibank vice-president, as part of these discussions. In June 1994, Old Neftegas contracted with Avanti International ("Avanti"), a Houston company, for equipment, installation, and related training needed for the Project. The Avanti–Old Neftegas contract required letters of credit from a prime bank. Also in June 1994, Old Neftegas engaged TPS to initiate and to conduct discussions for financing for the Project with third-party financial institutions for up to $60 million. The same month, TPS engaged Citibank to structure

---

* The Honorable Tim Taft, retired justice, Court of Appeals for the First District of Texas, participating by assignment.

the transaction and to provide financing because TPS did not have the experience to do so itself. The principal Citibank representative interacting with TPS and the Neftegas entities throughout the transaction was Kermath.

Over the next three and a half years, the Project and its proposed financing underwent three phases:

1. *Phase I:* this phase was structured to be a credit facility with Old Neftegas as the borrower and with the Exim Bank, pursuant to the Oil and Gas Framework Agreement ("OGFA") between Russia and the United States, as guarantor.

2. *Phase II:* this phase was structured to be a 36–month "pass through" revolving credit facility[1] in which TPS was Citibank's borrower and Old Neftegas was TPS's borrower.

3. *Phase III:* this phase was structured so that the joint venture JSCNI would enter into a lease with TPS, which as lessor would assume the Avanti contract and be Citibank's borrower under a three-year, revolving credit facility.

The transaction's phases, and the operative documents for Phase III (which is at issue here), are set out in detail later in the opinion. Over the Project's three phases, the Neftegas entities periodically paid fees to, or expenses of, TPS and Citibank.

The closing on the Phase III operative contracts took place in Houston, Texas on August 15, 1997. Present at the closing were Kermath, Rafikov, Sartan, and TPS representatives, among others. The parties disputed at trial whether, before the contracts were signed, Rafikov and Kermath negotiated a security-deposit schedule for collateral different from the one contained in the contracts signed that day, including an initial security deposit of $550,000. JSCNI's evidence, however, showed that this verbal discussion and agreement occurred. The parties also disputed at trial whether Kermath represented, both at the closing and at a post-closing dinner, that financing would be provided shortly after JSCNI sent Citibank the first security deposit of $550,000. Again, however, JSCNI's evidence showed that Kermath made such statements.

The Phase III contracts signed on August 15 made JSCNI the lessee of the Project equipment, made TPS the equipment's lessor, made TPS the borrower of Citibank, and authorized TPS to pursue financing on terms and conditions acceptable to it. Pursuant to that authority, TPS and Citibank agreed to a revolving credit facility that contained two aspects at issue in this appeal: (1) a $40–million facility limit, which was less than the facility limits in Phases I and II; (2) collateral consisting entirely of cash investments or United

---

[1]. Generally speaking, a revolving credit facility is "one that goes up and down as the needs of the borrower vary. Typically, there is a maximum borrowing amount and if the loan is asset based then a formula for how much of that line is available ... is set forth.... The revolving credit line will terminate on a date certain; however, within that time frame the borrower may pay down the loan and/or borrow at any time." Robert J. Ingato & Maury B. Poscover, *Commercial Finance*, SUCCESSFUL PARTNERING BETWEEN INSIDE & OUTSIDE COUNSEL, § 53:21 (Robert L. Haig ed., West & ACCA 2010) (2000); *see also* DICTIONARY OF LEGAL TERMS: SIMPLIFIED GUIDE TO THE LANGUAGE OF LAW 431 (3rd ed.1998) (defining revolving credit as "renewable credit over a set period of time. The term refers generally to credit extended by a banker or merchant for a certain amount that can be paid off periodically."). RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 1649 (2nd ed.2001) (defining revolving credit as "credit automatically available up to a predetermined limit while payments are periodically made").

States government obligations;[2] and (3) a prerequisite to financing that TPS, which had a negative net worth, maintain a minimum net worth of $500,000 and an asset-to-liability ratio of 1:1.

On November 5, 1997, Kermath sent TPS a commitment from Citibank for financing Phase III ("the Commitment Letter"). The Commitment Letter indicated that financing was conditional on several things. One of the conditions to the facility's effectiveness was "initial funding of at least $550,000" in an account designated by the Phase III contracts. The evidence favorable to JSCNI is that this "initial funding" was the initial security deposit that Kermath and Rafikov had negotiated at the August 15 closing. All parties knew that the $550,000 security deposit would come from JSCNI because TPS had a negative net worth at the time. The Commitment Letter also recited the $40–million credit-facility limit and the full-cash-collateral requirement. TPS solicited the $550,000 payment from JSCNI, but forwarded only part of the Commitment Letter to it, omitting the pages on which the credit-facility limit and full-cash-collateral requirement appeared.

JSCNI paid the $550,000 to Citibank. Unbeknownst to JSCNI, some of these funds were spent on repayment of Santos, payment of Citibank's legal and advisory fees, draws to Karber and Abji, and payment of certain of TPS's expenses.

In December 1997, Citibank revoked the Commitment Letter, stating that the sole basis for the revocation was its having learned that Karber had a criminal history. The parties disputed at trial whether Kermath knew from the Project's start that Karber had a criminal history, but JSCNI's evidence showed that he did. Al-though JSCNI contended below that Citibank's revocation was pretextual, it has abandoned on appeal any theory of recovery based on Citibank's failure to finance the Project. At the end of the day, not only did the Project fail, but TPS reimbursed JSCNI only $100,000 of its $550,000 security deposit.

Avanti was the first to file suit, alleging claims against TPS and Citibank. Avanti's claims were disposed of in ways that are immaterial to this appeal. JSCNI intervened in Avanti's suit, alleging claims against TPS and Citibank. By the time of trial, JSCNI was alleging the following claims:

- fraud against Citibank and TPS,
- negligent misrepresentation against Citibank and TPS,
- breach of fiduciary duty against Citibank and TPS,
- knowing participation in breach of fiduciary duty against Citibank, and
- conspiracy.

The trial court charged the jury on all claims except the negligent-misrepresentation claims against both TPS and Citibank. The jury found TPS liable for fraud and breach of fiduciary duty and awarded actual damages of $315,000 (70% of $450,000) for fraud and $1,181,000 for breach of fiduciary duty. The jury found Citibank liable for fraud, knowing participation in TPS's breach of fiduciary duty, and conspiracy in TPS's breach of fiduciary duty and fraud. It awarded actual damages of $135,000 (30% of $450,000) for fraud and exemplary damages of $2.25 million against Citibank. The trial court rendered judgment on all aspects of the verdict against TPS and rendered judgment against Citibank on

**2.** JSCNI refers to the requirement for cash-investment and government-obligation collateral as the "full-cash-collateral requirement."

We adopt JSCNI's terminology for ease of reference.

the jury's finding of fraud and the related actual damages. The trial court granted Citibank's motion for JNOV on the jury's findings against it for knowing participation in TPS's breach of fiduciary duty, for conspiracy, and for exemplary damages.

JSCNI and Citibank appeal, but TPS does not.

## CITIBANK'S APPEAL

In three issues, Citibank argues that it is entitled to a take-nothing judgment as a matter of law on JSCNI's claim for fraud. Specifically, Citibank argues that the trial court erred in denying its motions for directed verdict and JNOV on this claim because (1) no evidence supports the jury's damages finding because the evidence conclusively proved that the disputed $500,000 payment was made not by JSCNI, but by a separate entity; (2) no evidence supports the jury's fraud finding; and (3) the verbal representations upon which JSCNI's fraud claim relies cannot support, for various reasons, the jury's finding or judgment.

### Standard of Review

When made on an evidentiary basis, rulings on a motion for JNOV and directed verdict are reviewed under the same legal-sufficiency test as are appellate no-evidence challenges. *See City of Keller v. Wilson,* 168 S.W.3d 802, 823, 827 (Tex. 2005). When, as here, an appellant attacks the legal sufficiency of an adverse finding on an issue for which it did not have the burden of proof, it must demonstrate that there is no evidence to support the adverse finding. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983). Such a no-evidence challenge will be sustained when " '(a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.' " *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003) (quoting *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997)).

In our legal-sufficiency review, "we must view the evidence in a light that tends to support the finding of disputed fact and disregard all evidence and inferences to the contrary." *Wal–Mart Stores, Inc. v. Miller,* 102 S.W.3d 706, 709 (Tex. 2003). Nonetheless, "[t]he final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review.... [L]egal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *City of Keller,* 168 S.W.3d at 827.

Particularized forms of this general standard of review apply in certain cases. For example, in cases "involving what a party knew or why it took a certain course," a court "cannot review whether jurors could reasonably disregard a losing party's explanations or excuses without considering what they were," although the reviewing court may nonetheless not "credit a losing party's explanations or excuses if jurors could disregard them." *Id.* at 817–18. Additionally, "when the circumstantial evidence of a vital fact is meager"—that is, when " 'the circumstances are equally consistent with either of two facts' "—we "must consider not just favorable but all circumstantial evidence, and competing inferences as well." *Id.* at 813–14 (quoting *Tubelite, a Div. of Indal, Inc. v. Risica & Sons, Inc.,* 819 S.W.2d 801, 805 (Tex.1991)). "Properly applied, the equal inference rule is but a species of the no-

evidence rule, emphasizing that when the circumstantial evidence is so slight that any plausible inference is purely a guess, it is in legal effect no evidence. But circumstantial evidence is not legally insufficient merely because more than one reasonable inference may be drawn from it. If circumstantial evidence will support more than one reasonable inference, it is for the jury to decide which is more reasonable.... " *Lozano v. Lozano,* 52 S.W.3d 141, 148 (Tex.2001) (Phillips, C.J., concurring & dissenting, joined by 4 JJ).

■ If more than a scintilla of evidence supports the jury's finding, "the jury's verdict ... must be upheld." *Miller,* 102 S.W.3d at 709. "[M]ore than a scintilla of evidence exists if the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004) (quoting *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997)). Conversely, evidence that is " 'so weak as to do no more than create a mere surmise' " is no more than a scintilla and, thus, no evidence. *Id.* (quoting *Kindred v. Con/Chem., Inc.,* 650 S.W.2d 61, 63 (Tex. 1983)).

■ The jury is the sole judge of witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary. *City of Keller,* 168 S.W.3d at 819. Because it is the jury's province to resolve conflicting evidence, we must assume that jurors resolved all conflicts in accordance with their verdict. *Id.* at 819–20. Likewise, "[e]ven if evidence is undisputed, it is the province of the jury to draw from it whatever inferences they [sic] wish, so long as more than one is possible and the jury must not simply guess." *Id.* at 821.

■ JNOV or directed verdict is also proper when a legal principle precludes recovery. *See John Masek Corp. v. Davis,* 848 S.W.2d 170, 173 (Tex.App.-Houston [1st Dist.] 1993, writ denied). To the extent that such a ruling is based on a question of law, we review that aspect of the ruling *de novo. See In re Humphreys,* 880 S.W.2d 402, 404 (Tex.1994) ("[Q]uestions of law are always subject to de novo review."); *Elliott v. Whitten,* No. 01–02–00065–CV, 2004 WL 2115420, at *3 (Tex. App.-Houston [1st Dist.] September 23, 2004, pet. denied) (memo.op.).

### Damages

■ Under issue three, Citibank argues that the trial court erred in denying its motion for JNOV because "[t]here is no evidence that [JSCNI] incurred expense damages of $450,000 attributable to the $550,000 payment" to Citibank. In support, JSCNI points to evidence that an entity named Sunflower Business Group ("Sunflower") paid the $550,000, that neither the payment nor any obligation of Sunflower appears on the financial statements or general ledger of JSCNI, and that no assignment concerning the funds between the two entities appears in the record. However, (1) JSCNI's written instruction for Sunflower to pay the $550,000 recited that the payment be made "in accordance with the terms and conditions of obligation taken to implement *the function of financial agent* ... " (emphasis added) and (2) a March 1998 agreement between TPS and JSCNI required that TPS transfer the entire $550,000 back *to JSCNI* (not Sunflower) if the loan did not close by March 31, 1998. This is some evidence that the $550,000 was JSCNI's and that Sunflower paid it as JSCNI's agent.

We overrule issue three.

## Legal and Evidentiary Challenges to Liability

Under issue one, Citibank argues that "there is no evidence to support the jury's finding of fraud against Citibank...." Under issue two, Citibank argues that Kermath's verbal representations could not support JSCNI's fraud claim for various reasons and, alternatively, that JSCNI could not reasonably have relied on those representations given the application of the statute of frauds.

### A. The Allegations, Charge, and Verdict

JSCNI alleged that Citibank had committed fraud by making false statements of fact, promises of future performance without intent to perform, and failure to disclose information when there was a duty to disclose. Specifically, JSCNI alleged that:

1. Citibank had falsely represented that it would arrange financing for the project;

2. Citibank had terminated its financing commitment for pretextual reasons, *i.e.*, because of Karber's criminal history; and

3. Citibank had a duty to disclose, but failed to disclose, the following facts: (a) that financing was still dependent upon due diligence relating to Karber's history, when Citibank (through Kermath) had represented that the deal was done and (b) that the $550,000 would be used in ways contrary to the way in which Citibank had represented that it would be used (as a security deposit).

JSCNI sought actual and exemplary damages.

▮ The jury was charged:

[F]raud occurs when:

a. a party makes a material misrepresentation,

b. the misrepresentation was made with knowledge of its falsity or made recklessly without any knowledge of the truth as a positive assertion,

c. the misrepresentation is made with the intention that it should be acted on by the other party, and

d. the other party relies on the misrepresentation and thereby suffers injury.[3]

Misrepresentation means:

a. a false statement of fact, or

b. a promise of future performance made with an intent, at the time the promise was made, not to perform as promised.

You are further instructed that fraud occurs when:

a. a party fails to disclose a material fact within the knowledge of that party,

b. the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth,

c. the party intends to induce the other party to take some action by failing to disclose the fact, and

d. the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

---

3. Under the common law, the plaintiff's reliance must be justifiable to support a fraud claim. *See, e.g., Ernst & Young, L.L.P v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001). The charge omitted the "justifiable" qualifier. However, Citibank objected to this omission, and the trial court overruled the objection. We thus measure the sufficiency of the evidence against the legally correct charge, which would include the omitted qualifier. *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex.2002).

The jury (1) found Citibank liable; (2) awarded actual damages of $450,000 to JSCNI, apportioning 30% responsibility ($135,000) to Citibank and 70% ($315,000) to TPS; and (3) having found clear and convincing evidence of fraud, awarded exemplary damages of $2.25 million against Citibank alone. The trial court denied Citibank's motion for JNOV on fraud liability and actual damages, as it had done in denying Citibank's earlier motion for directed verdict, but granted its JNOV on exemplary damages.[4]

### B. The Bases for JSCNI's Fraud Claim

On appeal, JSCNI admits that its fraud claim "is based upon Citibank's misrepresentations and failures to disclose information that caused [JSCNI] to transmit $550,000 to Citibank as an initial security deposit for the Transaction." In support of this fraud theory, JSCNI identifies only three bases comprising its claim: (1) that Citibank made false statements of fact through Kermath in connection with the use of the security deposit; (2) that Citibank made false statements of fact through Kermath that the transaction was complete after the negotiation of the scheduled amounts of security deposit at the August 15, 1997 closing; and (3) that Citibank failed to disclose material information that made earlier representations misleading or untrue. JSCNI further expressly rejects that it pursued or is pursuing any theory of fraud based upon "Citibank's failure to provide funding for the Project." We construe JSCNI as having abandoned on appeal any theory of fraud other than those relating to the $500,000. *See Martin v. Martin, Martin & Richards, Inc.,* 991 S.W.2d 1, 4 n. 1 (Tex.App.-

Fort Worth 1997) (noting that appellees abandoned summary-judgment ground of collateral estoppel by stating in appellate brief that "they do not rely upon that doctrine"), *rev'd on other grounds,* 989 S.W.2d 357 (Tex.1998); *Commercial Ins. Co. of Newark, N.J. v. Williamson,* 328 S.W.2d 796, 797 (Tex.Civ.App.-San Antonio 1959, no writ) (noting that appellee had abandoned sole ground that his controverting plea to plea of privilege had raised in trial court and not considering that ground on appeal). Because we no longer need to reach them, we overrule those challenges of Citibank's under issues one and two that attack the rendition of judgment on any fraud theory not relating to the $550,000 security deposit—specifically, that Citibank committed fraud by having structured an unfair transaction and by falsely having promised to arrange financing.

### C. Citibank's Statements Concerning the Use of the $550,000

In the remainder of its issues one and two, Citibank challenges the legal sufficiency of the evidence supporting the jury's implicit findings of intent and reliance. We begin with the theory that Citibank committed fraud by misrepresenting the $550,000's use.

What the parties believed the nature of the $550,000 to be, and how they believed that it would be used, must be gauged in light of any applicable contractual terms to which they agreed. We thus begin with the pertinent language of the Phase III contracts and of the agency contract between Old Neftegas and TPS ("the Engagement Agreement") before turning to the remaining evidences.[5]

---

4. The ruling granting the JNOV on exemplary damages is the subject of JSCNI's separate appeal.

5. In its appellee's brief, JSCNI relies in part upon terms from agreements from Phases I and II. These contracts were superseded by the Phase III contracts. We thus do not consider those earlier contractual terms.

### 1. The 1994 Engagement Agreement

The June 14, 1994 Engagement Agreement between TPS and Old Neftegas engaged TPS on an exclusive basis to provide financial advisory services for the project to Old Neftegas, with financing being up to $60 million. TPS was empowered to initiate and to conduct discussions for financing with third-party financial institutions. As for TPS's agency, the agreement provided:

> Except as expressly empowered in writing to do so by [Old Neftegas], TPS will not have authority to accept any offer or proposal of Financing from, or enter into any commitment with, third parties on behalf of [Old Neftegas].... [Old Neftegas] agrees to indemnify, defend, and hold harmless TPS from and against all losses, costs, expenses (including attorneys' fees) and liabilities arising in connection with (1) TPS's performance of its services hereunder and (2) the Financing obtained in connection herewith, except to the extent such losses are the result of the sole negligence or misconduct of TPS.

### 2. The Participation Agreement

The Participation Agreement—which TPS, JSCNI, and the guarantors (named below) signed—provided that "Deposits" would be made to a "Designated Account" at Citibank "for the benefit of [TPS]." "Deposits" were defined as any sums paid *as guarantor* under the transaction to TPS, and "Designated Account" was defined as "an account maintained by [TPS] at [Citibank] and to which the Deposits will *initially* be transferred." (Emphasis added.) The agreement also provided for an "Initial Deposit," in the aggregate amount of $350,000, which *the guarantors* agreed to pay. This Initial Deposit was due on the first "Deposit Date," which was then set at September 1, 1997 (and later extended). The payment of this Initial Deposit was the "Trigger Date," within two days after which TPS was to authorize Avanti to begin construction.

TPS was to be paid a "Transaction Fee"—totaling $1.8 million—as compensation for arranging the lease financing. The Transaction Fee would be paid in six $300,000 installments, under a schedule starting 30 days after the date that an Initial Deposit was made by any guarantor, *i.e.*, the Trigger Date. With five days' written notice to the guarantors, TPS could take from the Deposits any of the Transaction Fees as they became due, even without an event of default. The agreement also provided that JSCNI would pay "Transaction Costs" to TPS, any credit provider, and the guarantors— in an aggregate of $100,000—which were described as certain attorney's fees of TPS, Citibank, and JSCNI and certain other transaction costs. Citibank's referenced attorney's fees were those accrued "in connection with [TPS's] financing of the purchase price of the Equipment" under the lease. JSCNI's obligation to pay Transaction Costs applied "without regard to whether the transactions contemplated hereby are consummated." However, anyone requesting payment of these costs had to submit its invoices to JSCNI, and JSCNI had the right to review and to approve any bills for legal expenses.

If the Participation Agreement or any other operative contracts were terminated because the Trigger Date did not occur, then JSCNI and the guarantors were required to hold harmless and to indemnify TPS for all losses, costs, expenses, claims, damages and liabilities incurred as a result of its being a party to the Participation Agreement and any other operative contract or its being engaged in the transaction, and JSCNI would still be liable for the Transaction Costs of up to $100,000. A similar covenant applied if the termi-

nation occurred after the Trigger Date, although TPS also agreed to apply all of the Deposits held in the Designated Account first, among other things, to repayment of itself for any amounts owed it by JSCNI under the Participation Agreement and the Equipment Lease. Finally, if termination occurred because of the failure of all conditions precedent to any operative document, then JSCNI would still be liable for the Transaction Costs, and the guarantors were required to hold harmless and to indemnify TPS for all losses, costs, expenses, claims, damages and liabilities incurred as a result of its being a party to the Participation Agreement and any other operative contract or its being engaged in the transaction.

### 3. The Guaranty Agreements

The Guaranty Agreements were executed by TPS and New Neftegas, Rodos International Ltd. ("Rodos"), and Donaclove Ltd. ("Donaclove"), the last two of which companies were affiliated in some way with New Neftegas. The Guaranty Agreements contained complementary provisions and adopted the other Phase III contracts' definitions.[6] The Guaranty Agreements required each guarantor to provide, *as security* for the guaranteed obligations, an "Initial Security Deposit" of $350,000.[7] (This appears to correspond to the Participation Agreement's Initial Deposit.) The guarantors were also required to collaterally assign certain product sales agreements to TPS and to make scheduled deposits of the proceeds generated under

those contracts. Like the Participation Agreement, the Guaranty Agreements required the guarantors to pay the Initial Deposit and all subsequent Deposits to TPS into the Designated Account maintained by TPS at Citibank. *The agreement clearly made all Deposits the property of TPS.* TPS was further authorized to apply the Deposits to the payment of its obligations under the "Credit Agreement" (which was never executed), to any payments due under the Equipment Lease Agreement (which never became effective), to the Participation Agreement's Transaction Fees (which were dependent upon the Trigger Date's occurrence), and to the acquisition and lease of the equipment under the lease (which never transpired). Any portion of the Deposits remaining after such obligations had been paid in full and the lease had been terminated were to be returned to the guarantors.

### 4. The Equipment Lease Agreement

The Equipment Lease Agreement—which TPS and JSCNI signed—likewise defined "Deposits" as any deposit made *by a guarantor.* Under its terms, TPS could tap into Deposit funds when an "Event of Default" occurred under the agreement. One of the conditions precedent to this agreement's effectiveness was that TPS receive financing "on terms and subject to considerations *acceptable to [TPS].*" (Emphasis added.)

### 5. The Commitment Letter

**6.** JSCNI was not a signatory to the Guaranty Agreements, but this contract was part of an overall structure to which JSCNI was a party, and the Participation Agreement, which JSCNI did sign, required that the Guaranty Agreements be executed. Moreover, Rafikov received the Guaranty Agreements as part of the August 15, 1997 closing, and he admitted that these agreements, along with the Equipment Lease and Participation Agreement,

"were all executed as part of one transaction."

**7.** Evidence favorable to JSCNI discussed further below shows that the security-deposit schedule and amounts were changed verbally by Kermath and Rafikov and were memorialized in a document signed by JSCNI and TPS. Other evidence indicates that even this later security-deposit schedule was later amended.

Pursuant to TPS's authority under the Equipment Lease Agreement to obtain financing, Citibank issued the November 5, 1997 Commitment Letter to TPS.[8] Under the heading "Collateral," the letter provided that Citibank would receive a first priority security interest in "one or more investment management accounts at Citibank ... owned by [TPS] or shareholders of [TPS] acceptable to [Citibank]." The letter defined these accounts as "Investment Accounts." As a condition to the facility's effectiveness and to the initial advance of letters of credit, the letter required that *"initial funding* of at least $550,000" be made "in the Investment Accounts"; that the Trigger Date described in the Participation Agreement have occurred; and that TPS pay "all outstanding legal and other expenses incurred by [Citibank] in connection with the transaction." (Emphasis added.) Additionally, the Commitment Letter provided that "[a]ll reasonable expenses, including legal expenses, for the account of [TPS] and Manuel Santos" be paid, providing that "[t]hose expenses incurred and billed before closing *are payable at closing."* (Emphasis added.)

### 6. The Remaining Evidence

The remaining evidence, either undisputed or viewed in the light most favorable to JSCNI, shows the following. At the August 15, 1997 closing, Kermath for Citibank and Rafikov for JSCNI negotiated the amount and schedule of all of the security deposits for the transaction.[9] The negotiated security deposits included the $550,000, which Sartan described as "the initial security deposit." Sartan, Kashuro, and Rafikov understood the $550,000 to be

a security deposit, and they believed that it would be spent only for a default under the lease and not, for example, to pay Citibank's legal fees or to fund an account for Santos. In later correspondence to TPS soliciting the $550,000, Kermath described the $550,000 as "the initial funding ... in the Investment Accounts" as the latter were defined in the Commitment Letter (TPS accounts in which Citibank would have a first priority security interest, *i.e.,* collateral accounts), and Citibank's internal confirmation of the payment's receipt described the payment as a security deposit. TPS's and JSCNI's November 1997 correspondence leading up to the payment described the $550,000 as a security deposit or "the first security deposit," as did Rafikov's confirmatory letter to TPS advising that payment had been made. Rafikov opined that "Citibank is supposed to control [the accounts containing the security deposits] as its own."

There was no testimony that any Citibank representative made oral representations distinguishing *the nature or use of the $550,000 security deposit* (other than its source being JSCNI and that it was the initial deposit) from the *nature or use of the other security deposits under the Guaranty Agreements.* For example, Rafikov opined that the $550,000 was "supposed to stay in that has been touched [sic] until it grew til $3 million" in total security deposits and admitted that he did not have a discussion with Kermath about the $550,000 security deposit's use because "it is recorded in the documents" and "[e]verything was written." Rafikov's testimony corresponds to an August 27, 1997

---

8. JSCNI was not a party to the Commitment Letter. Citibank issued the letter pursuant to TPS's authority to obtain financing acceptable to it, and that authority came from the Equipment Lease Agreement, which JSCNI had signed.

9. Kermath denied that this conversation occurred, but the standard of review precludes our considering his testimony.

schedule that TPS's Abji sent to JSCNI's Kashuro, showing revised "minimum security deposit amounts as agreed."[10] Rafikov and Kashuro testified that the revisions in Abji's August 27 correspondence reflected the security-deposit agreement that Rafikov and Kermath had reached at the August 15 closing, modifying the Guarantee Agreements' schedule of deposits.[11] The attached revised schedule showed an initial "minimum security deposit" of $550,000 in July 1997—with a Transaction Fee of $300,000 payable during the same month (and a $1.8 million total fee)—followed by four more minimum security deposit payments of $612,500 each over an 18–month period. Rafikov testified that the five scheduled payments together equaling $3 million were all security deposits. JSCNI relied on the August 27 revised security deposit schedule at trial.

The $550,000 was deposited into an account styled the "Transcontinental Products & Services No. 2" account. An internal Citibank email dated November 19, 1997 stated that the wired funds had been credited to "TPS # 2 DDA Account" and noted that the funds "will be transferred today into TPS's Landmark account until further distribution at closing" of the loan. Kermath believed that the receiving account was a checking account of TPS. However, the account information instead corresponds to a TPS account at Citibank that was established in Phase II to serve as a receiving point for "cash payment credit payments"—for which TPS would lend up to $9 million to JSCNI through reimbursement of letters of credit—under a Transaction Agreement that never came to fruition. Because the Phase II contracts were superseded by those of Phase III, it is unclear what the designated purpose of this account was when it received JSCNI's $550,000, except that it was in TPS's name. However, the evidence does not indicate that it was the collateral Investment Account for which the Commitment Letter provided.

One hundred thousand dollars of the $550,000 was ultimately reimbursed to JSCNI, but the remainder was used for things such as repayment of Santos (TPS's shareholder and an important client of Citibank's apart from this transaction), payment of Citibank's legal and advisory fees, draws to Karber and Abji, and payment of certain of TPS's expenses. The evidence viewed in the light most favorable to JSCNI indicates that Citibank advised TPS to make at least some of these payments. For example, on November 21, 1997, two days after JSCNI's payment of the $550,000 and in response to an internal Citibank email asking for account information for "accounts that will hold collateral," Kermath advised by internal bank email

10. Kermath contended that this revised schedule was inaccurate because, among other things, its deposit schedule contravened what the intended build up of cash collateral was supposed to be. Kermath also denied that the revised schedule was a product of the August 15 closing discussions, and he denied that security-deposit discussions occurred at that closing. However, the standard of review precludes our considering his testimony on these points.

11. The record indicates that the minimum security-deposit schedule agreed on August 15 and memorialized in Abji's August 27 correspondence was later altered. For example, Abji himself testified that, according to the latest schedule agreed before the Commitment Letter's issuance, the initial $550,000 was due in September, followed by deposits of $144,000 each month through February. And Citibank's November 1997 internal request for approval of financing indicates still another collateral schedule. These later alterations to the August 15 minimum security-deposit schedule agreed to by Kermath and Rafikov do not affect Kermath's representations at the August 15 closing, on which JSCNI's fraud claim is based.

that an " 'Investment Account' " would be opened and that it would "hold *part* of the initial funding of $550,000" (emphasis added), but that "the rest" of this money would "be in [Manuel Santos's] account— another 'Investment Account.' " Abji testified that it was "Citibank's"—specifically, Kermath's—"advice that part of [the $550,000] go to Manuel Santos's account" and that TPS reimbursed Santos from the $550,000. Likewise, according to Karber's recollection of a November 24, 1997 meeting between TPS and Citibank, Kermath stated that "we need to change this 550." [12] Karber understood that the "change" that Kermath meant was that "the money was not going to be retained by Citibank" or to "remain in the collateral account." Instead, Karber understood that the $550,000 would be used to pay Citibank's and TPS's attorneys, to pay TPS's overhead, and to reimburse Santos and that "TPS could use all the money under ... this $550,000 because the bank knew that we needed the money and we had to have the $550,000"—all understandings that Karber got from Kermath and Roberts.[13] Karber testified that he heard Kermath say that "this is what we are going to do here" with the $550,000. A summary of some of the uses of the $550,000 indicated that, from TPS's account into which the $550,000 was sent, $23,842 was paid the very next day (on November 25, 1997) to Citibank's legal counsel; $10,000 was paid on December 19 to TPS's legal counsel;

and $1,625 in expenses and reimbursements were paid on November 25 and December 19 and 30. The summary also indicated that $20,500 of the $550,000 was paid to Manuel Santos in late December 1997, although the summary shows this money coming from another account. The total payments indicated—several clearly paid to TPS representatives—were $185,870.[14]

Abji and Karber understood the $550,000 to be a partial payment or prepayment of the total $1.8 million in Transaction Fees that the Participation Agreement allowed TPS. However, nothing indicates that TPS gave JSCNI the five-day notice to guarantors required for taking Transaction Fees from the security deposits. Likewise, Kermath's testimony could be read to imply that the $550,000, like all security deposits, was useable at that time to pay transaction expenses, including Citibank's attorney's fees; however, nothing shows that Citibank submitted its attorney's fees bills to JSCNI for review and reimbursement as Transaction Costs, as required by the Participation Agreement.

### 7. Citibank's Arguments

Citibank argues that any oral representations that the $550,000 would be held only as a security deposit or would be under Citibank's sole control cannot support the fraud judgment because the Phase III contracts contradicted any such

---

12. Karber's testimony indicates that the referenced change was interlineated on the Commitment Letter. The interlineation corresponds to the insertion of the word "initial" before the phrase "funding of at least $550,000" in that document. The word "initial" was omitted from the truncated version of the Commitment Letter that TPS sent to JSCNI.

13. Kermath denied that Citibank instructed TPS on the $550,000's use for these or any

other things and testified that Karber had wanted to use $250,000 of the $550,000 to fund an account for Santos because Santos "had asked that that be done that way." However, the standard of review precludes our considering this testimony of Kermath.

14. Citibank does not complain that the amount of payments shown on JSCNI's summary does not equal $135,000, the amount for which the jury found Citibank liable.

representations. Specifically, Citibank contends that

1. the Guaranty Agreements allowed for these funds to be used as authorized by the Participation Agreement;
2. the Participation Agreement provided that this deposit become TPS's property upon deposit;
3. the Participation Agreement, the Guaranty Agreements, and the Commitment Letter allowed for TPS to apply the funds to credit-agreement obligations, to acquire and to lease equipment, or to pay itself the $1.8 million Transaction Fee and Transaction Costs;
4. the June 1994 "Engagement for Financial Services" agreement between TPS and Old Neftegas required the latter to reimburse the former promptly for all out-of-pocket expenses incurred in negotiating financing; and
5. Citibank had no right to interfere with TPS's use of the funds unless and until the transaction closed. In this last regard, Citibank urges that even if TPS misspent JSCNI's funds, there is no evidence that Citibank did so or that it "directed TPS to make [the] distributions" of which JSCNI complained.

Citibank contends that JSCNI's reliance on any oral statements concerning the $550,000's use and Citibank's control over it that differed from the contractual provisions was, as a matter of law, unreasonable. Citibank further contends that, because the Phase III contracts authorized TPS's use of the funds when they were spent, there is no evidence of materiality or scienter by Citibank. Finally, Citibank argues that reliance on any oral representations contrary to the Phase III contracts was unreasonable given the application of the statute of frauds and the contracts' merger clauses.

## 8. Discussion

■■■ The parties point us to no evidence that any Citibank employee represented that the $550,000 security deposit would be treated differently, once placed in TPS's account, from the remaining security deposits required under the Guaranty Agreements. It thus appears that the only representations by Citibank concerning the $550,000's use or Citibank's control over it were made in (1) Kermath's November 9, 1997 correspondence about the Commitment Letter and the Commitment Letter itself, the payment requests that Kermath expected TPS to convey to JSCNI, and (2) Kermath's statements at the August 15 closing concerning a minimum security-deposit schedule, the terms of which were memorialized in Abji's August 27 schedule, sent to Kashuro, that TPS and Rafikov signed.[15] We thus focus on these representations.

Nothing in these representations indicates that Citibank would have sole control over the $550,000 until closing. In fact, the account into which the funds were deposited was in TPS's name, this was a TPS account other than the Investment Account for holding collateral, and TPS was not contractually required to assign Citibank a security interest in its funds until after closing.

But this does not necessarily insulate Citibank from liability. First, and con-

15. Citibank's only statements to JSCNI were made or memorialized in these documents, which were (1) writings signed by Kermath for Citibank or (2) a written modification to the Guaranty Agreements that TPS's Abji signed, when the Guaranty Agreements permitted modifications if in writing and signed by TPS. We thus overrule Citibank's challenges based on the statute of frauds and the parol evidence rule.

trary to Citibank's assertions, the evidence favorable to JSCNI *does* show that Citibank advised TPS on the nature of the funds and how to spend them. For example, Citibank advised TPS to use these funds to reimburse Santos—who was, along with his family, a very important, preexisting client of Citibank independent of this transaction—and to pay Citibank's attorney's fees. Within days of receiving JSCNI's money, Kermath told TPS's Abji and Karber that "we need to change this 550" thousand dollars, advising TPS on how to spend the money.

Second, Kermath's cited representations indicated that the $550,000 would be held under the same terms as would all other security deposits. It was thus reasonable for JSCNI to rely on its $550,000's being treated the same as the other security deposits under the Phase III contracts, even though JSCNI was not a guarantor. Citibank contends that TPS spent JSCNI's deposit as the Guaranty Agreements and the Participation Agreement allowed, but the evidence viewed in the light most favorable to JSCNI shows that TPS did not. For example, although the Participation Agreement defined the Trigger Date as the date on which an Initial Deposit was made by a guarantor, TPS and Citibank did not treat the date of JSCNI's $550,000 payment as the Trigger Date—as evidenced by, among other things, TPS's failure to instruct Avanti to begin construction. In any event, the Participation Agreement did not allow TPS to withdraw its Transaction Fee until 30 days after the Trigger Date had occurred.[16] The Participation Agreement thus did not allow TPS to use JSCNI's funds to pay itself a portion of the Transaction Fee at that time. The jury could have reasonably discredited

Abji's and Karber's testimony that the $550,000 was disposable as part of the Transaction Fee when the contracts did not then allow it. Additionally, although the Guaranty Agreements allowed TPS to apply security deposits toward certain obligations of JSCNI under other Phase III contracts (credit agreement obligations, lease agreement obligations, leasing of equipment, and Transaction Fees), those obligations were not triggered because the operative events or contracts never occurred or became effective. Furthermore, although the Participation Agreement obligated JSCNI to pay Citibank's and TPS's Transaction Costs, whether or not Phase III came to fruition, JSCNI's liability was limited to $100,000 total (here, $450,000 was spent), and JSCNI was given the opportunity to review and to approve submitted expenses from both Citibank and TPS (which did not occur here).

Third, Citibank argues that the Commitment Letter—between only Citibank and TPS, not JSCNI—authorized the use of JSCNI's security deposit to pay TPS, Citibank's, and Santos's expenses. The Commitment Letter contained a condition precedent that TPS pay all reasonable expenses (including attorney's fees) of itself and Santos and all outstanding legal and other expenses of Citibank arising from the transaction. However, the Commitment Letter established only the obligation to pay; it did not establish from what source those payments would come. If the Equipment Lease and Guaranty Agreements (to which JSCNI was a direct or indirect party) did not authorize the use of this security deposit for such reimbursements *at the time that it was used,* then neither could the Com-

---

**16.** Citibank does not argue that the amendment to the Guaranty Agreement memorialized in Abji's August 27, 1997 letter, showing the first installment of the Transaction Fee being due the same month as JSCNI's $550,000 security deposit payment, allowed TPS to withdraw its fee before the Trigger Date's occurrence.

mitment Letter.[17] We have already concluded that neither the Equipment Lease nor the Guaranty Agreements then authorized these disbursements in this manner. Moreover, regarding TPS's reimbursement of itself and Santos, the Commitment Letter also provided that those expenses incurred and billed before financing's closing were not payable *until* closing, *i.e.*, they were not payable at the time that Citibank advised TPS to pay them. Roberts confirmed that "it is customary for us to have the borrower pay for all the outstanding expenses incurred in that transaction *at the time of closing*." (Emphasis added.) A jury could have reasonably discredited Kermath's testimony that he believed the $550,000 to be so useable because the Commitment Letter did not then allow it.

The jury could have reasonably viewed this evidence as showing that Citibank advised TPS to use JSCNI's funds in ways that the Phase III contracts did not then allow, despite Kermath's representations to JSCNI that the funds would be treated as any other security deposit under the Phase III contracts. Accordingly, we reject Citibank's argument that the Phase III contracts' terms negate, as a matter of law, reasonable reliance by JSCNI that the $550,000 would be treated in the ways that Kermath represented.

There is also some evidence that Kermath's statements were promises of future performance made with the intent, at the time that they were made, not to perform as promised, *i.e.*, there is evidence of scienter. *See Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex.1986) ("A promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving, and with no intention of performing the act."). For example—only 12 days after Kermath sent the Commitment Letter, only two days after JSCNI sent the funds in response, and only three days before Kermath advised TPS to use the $550,000 to pay Citibank's fees and to reimburse its important client Santos—Kermath was already advising by internal Citibank email that (1) part of the funds would be placed in Santos's account, rather than in an Investment Account for the transaction, and (2) TPS would "give [Citibank] the check for the legal fees and retainer" very shortly thereafter. Kermath also testified at trial that if TPS—which he knew had a negative net worth at the time—spent the $550,000 before closing and did not replenish it, the financing could not close. There was also evidence that at the November 24 meeting at which TPS signed the Commitment Letter, Kermath indicated that a "change" to the $550,000 would need to occur and advised TPS how those funds should be used. A jury could reasonably have believed that these actions, which occurred very shortly after Kermath solicited the $550,000, reflected a prior intent to do other than was represented, with an intent that Citibank and its major client be reimbursed before any further risk attached. *See id.* at 434–35 ("While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made.... 'Slight circumstantial evidence' of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent.").

**17.** Likewise, the 1994 Engagement Agreement, which Old Neftegas signed and which allowed TPS to be reimbursed costs and expenses from JSCNI, did not speak of the source, method, or timing of their reimbursement. In contrast, the Phase III contracts *did* specify when, how, and for what purposes funds (like JSCNI's $550,000) paid according to their terms could be used, and we have already explained how these contracts did not allow these uses at this time or in this manner.

Furthermore, an email from Citibank's internal credit documents—dated *after* the August 15 closing but *before* Kermath sent the Commitment Letter—explained that "John Kermath tells me the company [TPS] will earn a $1.8MM fee [the Transaction Fee] *upon the [final] closing of the deal* from [JSCNI] which is payable over 5 months...." This indicates that Kermath knew before he sent the Commitment Letter that the $550,000 would not form part of TPS's Transaction Fee when it was paid. Finally, by internal Citibank memorandum dated September 19, 1997 (after the August 15 closing but before the Commitment Letter), Kermath advised that "[i]n light of the fact that the TPS transaction appears to be coming to fruition, we will reestablish a relationship with Manuel [Santos] via a $250,000 time [sic] deposit that will be rolled over on a periodic basis but will not be available for personal liquidity purposes." Although nothing shows that JSCNI's $550,000 was actually used to establish such an independent account for Santos—as opposed to the funds' use to reimburse Santos for expenditures—Abji testified that Kermath advised TPS to use the $550,000 deposit to establish this account. A rational jury could view this as evidence of Kermath's intent, before issuance of the Commitment Letter, to use the $550,000 to establish an account totally unrelated to the JSCNI transaction, for the benefit of an important client of Citibank's.

Given all of the circumstantial evidence of scienter, the jury could have reasonably discounted any of Abji's, Karber's, and Kermath's testimony implying that the money was solicited without such intent. *See id.* at 434 ("Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony.").

We overrule Citibank's challenges under issues one and two to this theory of fraud liability. Having found legally sufficient evidence of one theory that will support fraud liability, we normally would not need to examine any other supporting theory. However, because the remaining two fraud theories require discussions relevant to claims or theories raised in JSCNI's appeal, we discuss them briefly below.

### D. Kermath's Statements That the Transaction Was Complete

█ For this theory of fraud liability, we need examine only the element of justifiable reliance. JSCNI presented the following evidence to show reliance on Kermath's oral statements. At the August 15, 1997 closing, Kermath said, "You send that money and you—and the transaction will be funded within 30 days"; "now we are going to give you financing"; and "we've been working on it for four years, we want to close it, and we are finally done with it." At a post-closing meeting in TPS's offices, Kermath told Rafikov that "this is the final issue. You give me money. I give you whatever. I finance the project...." At the post-closing celebratory dinner the same night, Kermath congratulated everyone, indicated that he was satisfied with the transaction's completion, and said things like "this time we finally ... did it" and "this is done and now the rest of the projects will just fall into place." Trey Roberts, Citibank's Team Leader in Investment Finance, testified that any statement on August 15, 1997 that the transaction was complete but for the $550,000 payment would have been untrue.

However, it was undisputed that the later-issued November 5, 1997 Commitment Letter, which TPS signed as borrower, recited that financing (and thus the Phase III transaction) was conditional upon, among other things,

1. Citibank's "completion of and satisfaction in all respects with our due diligence investigation," which was described as "[d]ue diligence on the identity and corporate documents of all parties to the Participation Agreement";

2. the "occurrence of the Trigger Date as defined in the Participation Agreement";

3. payment by TPS "of all outstanding legal and other expenses incurred by [Citibank] in connection with the transaction";

4. the absence of a material adverse change in the financial condition, operations, or prospect of TPS since its June 30, 1997 financial statements; and

5. Citibank's "not becoming aware after the date of any information or other matter affecting [TPS] or the transactions inconsistent in a material and adverse manner with any such information or other matter disclosed to us prior to the date hereof."

It was undisputed that TPS faxed to Rafikov—and that Rafikov saw—the pages of the Commitment Letter containing these terms *after* Kermath's August 17 statements and *before* JSCNI paid the $550,000 to Citibank. It was thus undisputed that Rafikov was advised, after Kermath's oral statements, that the transaction was incomplete because contingencies existed—regardless of how likely they were to transpire or for what reason Citibank ultimately refused funding.

 For purposes of a fraud claim, a party cannot justifiably rely on a representation when that party has actual knowledge before its reliance of that representation's falsity. *See Mayes v. Stewart,* 11 S.W.3d 440, 451 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) ("Actual knowl-

edge is inconsistent with the claim that the defrauded party has been deceived, and it negates the essential element of reliance upon the truth of the representation."); *see also Prospect High Income Fund v. Grant Thornton, L.L.P.,* 203 S.W.3d 602, 614 (Tex.App.-Dallas 2006, pet. granted) (holding that summary judgment was properly rendered on fraud claim because element of justifiable reliance was defeated by evidence that sophisticated third-party business plaintiffs knew, before purchasing certain bonds, that statements in audits were inaccurate). Accordingly, we hold that there was no evidence that JSCNI justifiably relied on Kermath's oral representations that the transaction was complete. We thus hold that this theory of fraud cannot support the judgment.

We sustain the challenge under Citibank's issues one and two to this theory of fraud liability.

**E. Citibank's Failure to Disclose Various Matters Relating to the $550,000 Payment**

 The jury was instructed that fraud occurs when

a. a party fails to disclose a material fact within the knowledge of that party,

b. the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth,

c. the party intends to induce the other party to take some action by failing to disclose the fact, and

d. the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

The first element is triggered only if the defendant had a legal obligation to disclose

the fact.[18] *See, e.g., Bradford v. Vento,* 48 S.W.3d 749, 755 (Tex.2001). Whether a duty exists is a question of law. *Id.* Absent a formal or informal fiduciary or confidential relationship—which JSCNI expressly disavows on appeal as a basis for Citibank's duty to disclose—a duty to speak may arise in the following situations: (1) one who voluntarily discloses information has a duty to disclose the whole truth; (2) one who makes a representation has a duty to disclose new information when he is aware that the new information makes the earlier representation misleading or untrue; and (3) one who makes a partial disclosure and conveys a false impression has a duty to correct it. *Anderson, Greenwood & Co. v. Martin,* 44 S.W.3d 200, 212–13 (Tex.App.-Houston [14th Dist.] 2001, pet. denied).

### 1. The Parties' Arguments

Citibank argues that it disclosed the facts upon which JSCNI's claim was based to TPS in the Commitment Letter and that it was TPS's duty, as the borrower in Phase III and as JSCNI's agent for communications for the Project, to convey this information to JSCNI. That is, Citibank contends that it had no duty to JSCNI. Citibank also notes that TPS sent a portion of the Commitment Letter to JSCNI, that JSCNI did not request a full copy of the Commitment Letter from Citibank when it saw that TPS had sent only three of five numbered pages, and that no evidence showed that Citibank attempted to conceal the Commitment Letter's terms from JSCNI. Additionally, Citibank urges that there was no evidence that Citibank intended to deceive JSCNI when TPS sent only a partial copy of the Commitment Letter to JSCNI.

JSCNI responds that Citibank's duty to disclose arose because it failed to disclose the whole truth and to correct a false impression arising from a partial disclosure. Specifically, JSCNI contends

1. that "when *Kermath represented that the Transaction was complete* and *solicited $550,000* from [JSCNI], he failed to disclose to [JSCNI]" that the loan had been reduced to $40 million;

2. that "given *Citibank's direct communications with [JSCNI] regarding the collateral requirements,* Citibank had a duty to inform [JSCNI] that it would only advance funds equal to 96% of the value of cash on deposit with the bank";

3. that "*[b]ased upon Citibank's direct representation to Neftegas that the transaction was complete,*" Citibank had a duty to disclose to JSCNI that financing was subject to a satisfactory investigation of Peter Karber, individually, and TPS establishing a minimum net worth of $500,000; and

4. that "[g]iven *Citibank's representations that the security deposits would be used as collateral for the lease/loan payments and subject to the exclusive control of Citibank,* Citibank had a duty to disclose that part of the $550,000 would be used to fund an investment account for Manuel Santos."

(Emphasis added.)

### 2. Discussion

---

18. Citibank objected to the charge on the grounds that (1) no evidence supported the fraud question's submission and (2) the failure-to-disclose instruction within the fraud question should not be submitted because "there is no duty to disclose as a matter of law either for TPS or Citibank. That is a matter for the Court to decide, and we believe the Court has erred in including that as a matter of law there was a duty to disclose." The trial court overruled the objection.

We agree that Citibank had no duty to disclose the terms of financing memorialized in the Commitment Letter directly to JSCNI. The jury found that Citibank was not JSCNI's agent, but found that TPS was. Under the Phase III Equipment Lease Agreement, which JSCNI signed, TPS was authorized to obtain financing "on terms and subject to considerations *acceptable to [TPS].*" (Emphasis added.) Pursuant to that authority, *and after the August 15, 1997 closing,* TPS and Citibank reached the terms set out in the Commitment Letter. Citibank sent the entire Commitment Letter to TPS, which Kermath anticipated that TPS would forward to JSCNI. TPS then forwarded only part of the Commitment Letter to JSCNI. Rafikov, realizing that the Commitment Letter that TPS had sent was incomplete, *asked TPS,* its usual agent for communications with Citibank throughout the Project, for a complete copy. When TPS responded that the omitted pages did not concern JSCNI, Rafikov accepted that explanation and did not then ask Citibank for a complete copy. Kashuro agreed that the reason that he did not ask Citibank for a complete copy of the Commitment Letter was that in "the ordinary course of communication," JSCNI corresponded with TPS, who had "its own dealings with." [19] The Commitment Letter contained all information that JSCNI contends that Citibank failed to divulge except for the revelation that the funds would be used to reimburse Santos.[20] The record is devoid of evidence, direct or circumstantial, that Kermath knew that TPS sent JSCNI a truncated version of the Commitment Letter or that anyone at Citibank made any misleading statements to JSCNI about the terms memorialized in the Commitment Letter after Kermath had sent that letter to TPS.

To hold Citibank liable *after* the Commitment Letter's issuance to TPS would be to hold that it continued to have a duty

---

**19.** Kashuro agreed that "it's the general course of business for [JSCNI] to deal with TPS and then TPS would deal with [Citibank]...." Sartan also testified that "98% of the time," communications went from TPS to Rafikov (or Sartan, for Rafikov) or from Rafikov (or Sartan) to TPS. This arrangement is corroborated by JSCNI's communications directly with TPS concerning the terms of financing. This also comports with the 1994 Engagement Letter, in which TPS was made JSCNI's agent to initiate and to conduct discussions for financing with third-party financial institutions. Finally, the jury found that TPS was JSCNI's agent. JSCNI points to several instances in which Citibank communicated directly with JSCNI. Several of these occurred before Phase III, when a completely different structure was contemplated—including that JSCNI would open an escrow account directly with Citibank, if JSCNI obtained the Russian Central Bank's approval. JSCNI also relies on (1) discussions between Citibank and JSCNI about the transaction's overall structure, when Citibank was acting as advisor, but not concerning the terms of the loan under Phase III,

when Citibank was acting as lender to TPS; (2) Kermath's telling Sartan "many times" over the parties' entire relationship that Citibank would look out for JSCNI's best interests in structuring the transaction; and (3) Kashuro's testifying that JSCNI took "advice" directly from Citibank and Citibank Moscow, without specifying time periods. The fact that Citibank spoke directly with JSCNI on certain occasions about various structuring matters, or that Kermath and Rafikov discussed security deposits at the closing, does not preclude Citibank's using the usual channel of communication with JSCNI's agent for communications, TPS, who was also Citibank's contractual borrower at the time.

**20.** We have already held that the jury could rationally conclude that Citibank committed fraud by affirmative misrepresentation when it solicited the $550,000 as a security deposit, but later used that sum to reimburse Santos. We thus do not need to examine whether Citibank had a duty to divulge this one matter.

to a non-client, to which it had made misleading statements in a transaction, *even after* it had corrected those statements to the non-client's designated agent for communications concerning the transaction. JSCNI cites no authority that would impose this kind of duty on Citibank in such circumstances, and we decline to recognize one here—especially when the parties to the transaction were sophisticated business people.

We sustain Citibank's challenge under issues one and two to this theory of fraud liability.

### JSCNI'S APPEAL

By three issues,[21] JSCNI argues that the trial court erred in granting Citibank's motion for JNOV on its request for exemplary damages against Citibank and its claims against Citibank for knowing participation in TPS's breach of fiduciary duty and civil conspiracy.

"We review the grant or denial of a motion for judgment notwithstanding the verdict under a legal-sufficiency standard." *Whitney Nat'l Bank v. Baker*, 122 S.W.3d 204, 207 (Tex.App.-Houston [1st Dist.] 2003, no pet.). "Generally, a JNOV can be rendered only when there is no evidence to support one or more of the jury's findings that are necessary...." *Triumph Trucking, Inc. v. S. Corporate Ins. Managers, Inc.*, 226 S.W.3d 466, 470 (Tex.App.-Houston [1st Dist.] 2006, pet. denied).

### Knowing Participation in Breach of Fiduciary Duty

In issue one, JSCNI argues that the trial court erred in disregarding the jury's verdict against Citibank for knowing participation in TPS's breach of fiduciary duty because legally sufficient evidence ex-

ists in support of the claim. "When a third party knowingly participates in the breach of a fiduciary duty, the third party becomes a joint tortfeasor and is liable as such." *Kastner v. Jenkens & Gilchrist, P.C.*, 231 S.W.3d 571, 580 (Tex.App.-Dallas 2007, no pet.) (citing *Kinzbach Tool Co. v. Corbett–Wallace Corp.*, 138 Tex. 565, 574, 160 S.W.2d 509, 514 (1942)).

### A. The Pleadings, Charge, and Rulings

JSCNI pleaded that TPS had breached its fiduciary duty to JSCNI. JSCNI also pleaded that Citibank had "knowingly participated in a breach of fiduciary duty by TPS to [JSCNI]."

Although the trial court granted Citibank's directed verdict on the knowing-participation claim, the court nonetheless submitted the claim to the jury:

> If the answer to Question No. 10 is "yes", then answer the following Question. Otherwise do not answer the following question.

> #### QUESTION NO. 18

> Did Citibank knowingly participate in TPS's breach of Fiduciary Duty to [JSCNI]?

> You are instructed that "knowingly" means actual awareness, at the time of the conduct, that TPS owed [JSCNI] a fiduciary duty, and that TPS was breaching that fiduciary duty. Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

The jury answered affirmatively.

The predicate for the above question was an affirmative answer to Jury Question No. 10, which was the liability question against TPS for breach of fiduciary duty:

**21.** After oral argument, JSCNI abandoned its issues four and five, concerning the exclusion of certain testimony. We thus do not reach these issues.

If your answer to Question No. 7 is "yes",[22] then answer the following question. Otherwise, do not answer the following question.

### QUESTION NO. 10

Did TPS breach its fiduciary duty to [JSCNI]?

As [JSCNI's] agent, TPS owed a fiduciary duty to [JSCNI]. To prove that it complied with its duty, TPS must show:

a. *The transaction in question was fair and equitable to [JSCNI]*;

b. *TPS made reasonable use of the confidence that [JSCNI] placed in [TPS]*;

c. TPS acted in the utmost good faith and exercised the most scrupulous honesty toward [JSCNI];

d. *TPS placed the interests of [JSCNI] before its own*, did not use the advantage of its position to gain any benefit for itself at the expense of [JSCNI], and did not place itself in any position where its self-interest might conflict with its obligations as a fiduciary; and

e. *TPS fully and fairly disclosed all important information to [JSCNI] concerning the transaction.*

(Emphasis added.) The jury answered Jury Question No. 10 affirmatively, and no one challenges that finding on appeal.

Citibank moved for JNOV on the affirmative answer to Jury Question No. 18

(knowing participation) on the basis that there was no evidence that Citibank knew that TPS was breaching a fiduciary duty to JSCNI or that it intentionally assisted TPS in breaching that duty. Citibank further moved for JNOV on the $1,181,000 awarded on Jury Question No. 12 (damages related to TPS's breach of fiduciary duty) because there was no evidence that JSCNI (as opposed to another corporate entity) suffered any damages and because evidence of those damages should have been excluded. The trial court granted JNOV on JSCNI's knowing participation claim, but denied JNOV on the basis of no evidence of damages.[23]

### B. Discussion

On appeal, JSCNI argues that Citibank knowingly participated in the breach of fiduciary duty that TPS committed by (1) failing to fully and fairly disclose material information concerning the transaction to JSCNI and (2) participating, as the transaction's advisor, in the structuring of a transaction that was simultaneously unfair and inequitable to JSCNI, did not make reasonable use of JSCNI's confidence in TPS, and placed TPS's interests before those of JSCNI.

We begin with the uncontested jury findings that TPS was JSCNI's agent and that it breached its fiduciary duty to JSCNI. JSCNI's appellate challenges relating to the latter finding are based solely

**22.** Jury Question No. 7 asked whether TPS was the agent of JSCNI. The jury answered this question affirmatively, and no one challenges that finding on appeal.

**23.** By cross-point in JSCNI's appeal, Citibank reurges its JNOV grounds concerning damages as a basis for affirming the JNOV on all of the jury's liability answers on which JNOV was rendered. *See* TEX.R.APP. P. 38.2(b)(1) ("When the trial court renders judgment notwithstanding the verdict on one or more questions, the appellee must bring forward by

cross-point any issue or point that would have vitiated the verdict or that would have prevented an affirmance of the judgment if the trial court had rendered judgment on the verdict."). Given our disposition of JSCNI's issues one and two, and because we have already ruled against Citibank on one of these damages contentions in its appeal (that relating to Sunflower's payment of the $550,000 security deposit), we need not reach Citibank's cross-points in this appeal.

on Citibank's knowing participation in (1) TPS's failure to divulge key information [24] and (2) TPS's structuring an unfair transaction.[25]

### 1. Participation in TPS's Failure Fully and Fairly to Disclose Certain Information to JSCNI

■ JSCNI argues that Citibank participated in TPS's failure fully and fairly to disclose (1) the full-cash-collateral requirement and (2) Karber's criminal history.[26] In support, JSCNI merely reurges an argument akin to that made with respect to the fraud-by-failure-to-disclose liability theories that we have already addressed: that Citibank's prior, direct communications with JSCNI through certain phases of the transaction created a duty for Citibank to disclose these specific matters *directly to JSCNI*, despite the jury's finding that Citibank was not JSCNI's agent, and despite the parties' usual arrangement for TPS to be JSCNI's agent for communications. This is, in its substance, a *direct*-liability argument based on the failure to disclose various matters despite an independent duty to do so, not an argument that Citibank can be vicariously liable by participation in the violation of *another's* duty. Moreover, JSCNI cites no authority that would support recognizing such a vicarious-liability-by-omission knowing-participation claim under facts like these.

In any event, as discussed in relation to Citibank's appeal, the undisputed evidence is that Citibank *did* divulge the full-cash-collateral requirement in its Commitment Letter to TPS, which was JSCNI's agent authorized to receive such communications for the Project, and there is no evidence that Citibank knew that TPS failed to disclose the full letter to JSCNI or that Citibank instructed TPS to disclose only part of it. Likewise, JSCNI points only to evidence that *Kermath* knew of Karber's criminal history; JSCNI does not point to any evidence that Kermath *knew that JSCNI* was ignorant of this fact, that he knew that TPS had not revealed same, or that Citibank did anything that would have aided any such conduct by TPS.

We overrule this argument under JSCNI's issue one.

### 2. Participation in TPS's Structuring an Unfair and Inequitable Transaction

#### *JSCNI's arguments*

■ In the remainder of issue one, JSCNI argues that Citibank participated in TPS's structuring an unfair and inequitable transaction. Specifically, JSCNI contends that TPS breached its fiduciary duty by accepting the Phase III transaction because

- the loan would allow TPS to borrow only the lesser of $40 million or the borrowing base—an amount "clearly less than the amount needed to fund the Project" and
- JSCNI would pay TPS and Citibank high fees, the transaction would be "free of risk" for both TPS and Citi-

---

24. JSCNI bases this challenge on one of the five possible implicit findings that could have supported the jury's affirmative answer to Jury Question No. 10: that TPS did not fully and fairly disclose to JSCNI all important information concerning the transaction.

25. JSCNI bases this challenge on other of the five possible implicit findings that could have supported the jury's affirmative answer to Jury Question No. 10: that the transaction was unfair and inequitable to JSCNI, that TPS did not make reasonable use of JSCNI's confidence in it, and that TPS placed its interests before those of JSCNI.

26. In one sentence, JSCNI also mentions the decrease of the credit facility amount to $40 million. To the extent that JSCNI may be asserting this as a basis for Citibank's vicarious liability, we reject it for the same reasons stated herein.

bank, and TPS would share in the joint venture's profits, while JSCNI "would essentially receive **nothing** . . . other than the ability to borrow its own money."

(Emphasis in original.) JSCNI argues that Citibank knowingly participated in this breach because TPS, which lacked experience in this type of transaction, hired Citibank to structure the transaction. JSCNI's reply brief clarifies that the focus is on Citibank's role as advisor, not on its role as lender.

### Citibank's and TPS's roles

It was undisputed that Old Neftegas engaged TPS as its agent to initiate and to conduct discussions for financing with third-party financial institutions up to $60 million and that Citibank knew of this agency. TPS hired Citibank, and relied on it, to advise and to structure this complex, international transaction because TPS did not have the experience to do so itself. According to Sartan, although "Citibank and TPS both were going to be advising [JSCNI] how to structure the transaction for it to be funded," "TPS was . . . a conduit in [the] transaction just to facilitate it [and] to make it happen easier." The record supports that Santos and Abji's prior connections with Citibank were a major reason for TPS's involvement as a "conduit" in this transaction, as TPS had experience neither in the oil and gas business nor in structuring complicated international financing.

### The transaction's three phases

JSCNI complains only about the structure and financing in Phase III; it does *not* complain that Phases I and II were unfair or inequitable to it. One cannot understand Phase III without understanding the structures that preceded Phase III

or the circumstances surrounding all phases, however. We turn to these now.

Phase I, begun in 1994, was to be a $51 million credit facility (85% of the total funding), with the borrower being Old Neftegas. The Exim Bank, pursuant to the OGFA, would guaranty 100% of the principal and interest. TPS would complete the financing by arranging, without Citibank's assistance, a 15% downpayment ($9 million) from a consortium of investors. The borrower was to be Old Neftegas, not TPS. The collateral would consist of an assigned term oil delivery contract; hard currency contracts for the sale of oil to creditworthy purchasers outside Russia (to represent sales in excess of 150% of the debt servicing); and collateral accounts, at a New York bank approved by the Exim bank, into which all oil-sale proceeds would be deposited and pledged. Citibank was to receive both a commitment fee and a structuring fee and was to be reimbursed certain expenses. TPS's expenses were also to be reimbursed. Phase I fell apart because the Exim bank would not guaranty the financing.

Phase II, begun in 1995, was far more complex and roughly took the form of a "pass through" loan from TPS (Citibank's borrower) to Old Neftegas (TPS's borrower). It came into being, in the words of Kermath, because "through some financial engineering, a slow down of equipment purchases and an increase in crude oil sales, the actual Russian risk in the deal diminished such that TPS was willing to commit more resources to close the gap to do an Exim-styled financing—without an Exim guarantee." The structure called for a 36–month revolving credit facility that would be available for draw-downs and for Citibank's issuance of letters of credit to Avanti for manufacture. The "Amount/Availability" was to be the lesser of $60 million "or the Lendable Value of

the Collateral . . . ," which was to be composed of four different things:

1. "Investment Accounts" of no less than $10 million (which could include securities and instruments) owned by TPS or acceptable third parties for the first year of the facility, to which standard advance rates would be used to determine Lendable Value;

2. a "Special Deposit Account" held by Citibank Moscow for Old Neftegas, to which a 98% advance rate would be applied to its "funds" to determine Lendable Value;

3. any account into which TPS received any payment from Old Neftegas, to which a 98% advance rate would be applied to its "funds" to determine Lendable Value; and

4. the pledge of two promissory notes that Old Neftegas would issue to TPS, one for $51 million and the other for $9 million, which were not assigned Lendable Values.

That is, the facility made available the lesser of $60 million or the Lendable Value (some at a 98% advance rate) of funds, securities, and instruments in certain pledged accounts. Old Neftegas contemplated executing and pledging to TPS an export-sales agreement with a company called Phibro, under which Old Neftegas would sell $200 to $250 million of crude oil, with part of the proceeds from those sales being deposited into one of these accounts. Under this structure, TPS would commit to lend monies to Old Neftegas to purchase equipment over 18 months, followed by a seven-year "fully amortizing payback period." TPS would in turn borrow against the cash build-up in the Collateral Account and against $10 to $20 million in investment management accounts that Santos and his family would pledge. TPS's individual payments to Avanti,

through letters of credit issued by Citibank, would constitute disbursements to Old Neftegas. Given the facility structure, Citibank would issue letters of credit only against the collateral accounts. Citibank was granted various fees, including an origination fee, a structuring fee, and fees for monitoring the collateral and issuing letters of credit. TPS's and Santos's expenses were payable at closing.

Phase II failed for several reasons. To begin with, although the Russian Central Bank issued a license to Old Neftegas, that license did not allow Old Neftegas to hold accounts in its name outside Russia. Also, the Phibro contract that was to fund the collateral account was never executed because a sale price could not be agreed. Additionally, various tax issues arose during Phase II: (1) a value added tax ("VAT") of about 15% to 20%, in JSCNI's counsel's opinion, which applied because TPS, a non-bank, was the borrower; (2) an excise tax of about $12 million, which Abji testified that Old Neftegas would have to pay if it purchased the equipment directly; and (3) a newly enacted customs tariff that JSCNI's counsel opined could have led to an increase of about 25% in the project's initial cost. To avoid these taxes, a possible joint venture involving Old or New Neftegas and TPS and a lease structure with TPS as lessor were discussed. Furthermore, around January 1997, the Russian taxing authorities seized Old Neftegas's Russian bank accounts to satisfy liability imposed retroactively by new taxation laws. Finally, around June 1997, Old Neftegas declared bankruptcy, at a time when it still had about $25 million in loans outstanding. New Neftegas was formed in mid–1996 in response to some of these problems, but it had no activity until 1997.

Phase III saw the implementation of both the joint venture and the lease struc-

ture. At this point in the transaction, in the words of an internal Citibank memorandum, the facility had "evolved from a trade finance structure to [a] cash secured facility." The financing and underlying transaction documents have been set out in detail above, but some important terms are summarized here. As for the financing, according to the Commitment Letter that TPS and Citibank signed, Phase III's financing involved a three-year revolving credit facility for the lesser of $40 million of the "Borrowing Base," which was defined as 96% of the "Loan Value," which was in turn defined as "market value times advance rate" of the collateral. The 4% discount on the Loan Value "accommodate[d] the interest reserve (a collateral reserve for up to 180 days of past due interest)." The collateral was to consist entirely of T-bills with maturities less than 12 months or cash investments. Kermath advised TPS of this full-cash-collateral requirement as early as May 1997 and again in the Commitment Letter.

Under the Guaranty Agreements, the source of the collateral was intended to be the guarantors' security deposits, which the contract permitted TPS to use for, among other things, its obligations under any credit agreement.[27] The deposits were to be supported by proceeds of oil-and-gas sales contracts that would be assigned to TPS.

Letters of credit could be issued only within the facility's first 27 months, and draws under letters of credit would be reimbursed automatically with a draw under the facility. No letters of credit would be issued unless fully supported by the Borrowing Base, i.e., 96% of the collateral value. Internal Citibank correspondence from May 1997 sets out this requirement,

as well, indicating that "any outlays to [Avanti] are fully supported by advance deposits made by [JSCNI] and affiliates on behalf of the Joint Venture...."

If the financing had closed, Citibank would have received an origination fee of $50,000, letters-of-credit fees, a collateral monitoring fee, and fees on the undrawn portion of the commitment amount of the facility.

### The $40 million revolving credit facility

By one sentence in its opening brief, JSCNI contends that TPS breached its fiduciary duty by seeking a credit facility of only $40 million, an amount that was "clearly less than the amount needed to fund the Project," rendering the transaction fundamentally unfair. By reply brief, JSCNI supports this brief argument by citing correspondence between Citibank and the Overseas Private Investment Corporation ("OPIC") in Phase II to demonstrate Citibank's knowledge that expenditures would be $56 million within the loan's first seven months.

The facilities in prior phases had been $51 and $60 million, respectively. Kermath's preliminary Phase III financing correspondence with TPS in April and May 1997 likewise indicated that financing would be in the amount of $60 million. JSCNI's witnesses opined that $60 million was still needed even in Phase III to buy the equipment and to build the infrastructure. Rafikov testified that $48 million was required for just the equipment, as contracts with Avanti reflected. The evidence in the light most favorable to JSCNI shows that JSCNI would not have pursued the deal if it had known that the financing facility was only $40 million.

---

**27.** JSCNI refers to all of these funds as its "own money," but the guarantors were New Neftegas, Rodos, and Donaclove, not JSCNI, and Donaclove was not a joint-venture participant.

Nonetheless, the above evidence concerned the total sums needed for equipment, building, and fees. In contrast, the only evidence of why the revolving credit facility amount was reduced to $40 million is that (1) that was the amount that was expected to be outstanding at any one time, from the projections that TPS provided Citibank, and (2) reducing the facility to that amount "saved . . . money on the unused fee [on which Citibank] charged a percentage against the amount of facility that is not used."[28] That is, because this was a revolving facility, the total letters of credit that Citibank would issue could surpass $40 million over time depending on repayment, but could not exceed $40 million at any one time.

JSCNI contends that correspondence between Citibank and OPIC indicates Citibank's knowledge that expenditures would be $56 million within the loan's first seven months. This schedule was generated in Phase II, not Phase III. JSCNI points to no equivalent evidence from Phase III. Moreover, Citibank's internal credit-approval application adopted a collateral schedule showing direct-product sale proceeds and security deposits that would exceed costs for equipment, infrastructure, and design costs at all times. Finally, as discussed earlier, although there is evidence that TPS withheld the new $40 million amount from JSCNI by failing to fax the page of the Commitment Letter that memorialized that change, there is no evidence that JSCNI did so or knew that TPS did.

Under these circumstances, Citibank's agreeing to $40 million says nothing about its knowledge of whether TPS was breaching its fiduciary duty to JSCNI by requesting that facility amount.

### The risk allocation, fees to Citibank and TPS, and what JSCNI received

The crux of the remainder of JSCNI's challenge is that the structure of Phase III was unfair to JSCNI because it required full cash or government-obligation collateral, made the borrowing base only 96% of that collateral, gave large fees to TPS and Citibank, removed all risk to them, and allowed TPS to share in 15% of JSCNI's profits from the underlying transaction. In support, JSCNI contends that it "essentially receive[d] **nothing** . . . other than the ability to borrow its own money." (Emphasis in original.)

In support of its complaint that Citibank knew that the structure of Phase III was unfair because the structure gave TPS "15% of the profits from the Project," JSCNI relies on the May 1997 joint-venture agreement among New Neftegas, TPS, and Donaclove. Nothing shows that the agreement was drafted by Citibank, and it was Old Neftegas's counsel that proposed a joint venture. The agreement divided property and profits among the three participants: 15% to TPS, 45% to Donaclove, and 40% to New Neftegas. JSCNI does not direct us to evidence that Citibank determined how profits would be shared among the joint-venture participants. Additionally, *all three* participants received profit shares under their agreement—with TPS receiving the smallest share. JSCNI does not explain how the division to which it agreed was unfair; why it was unfair for a joint-venture participant (TPS) to receive a share of profits,

28. One of JSCNI's complaints about the transaction's structure is that under the Commitment Letter, Citibank would be paid fees "on the unused borrowing base for the term of the credit facility." Reducing the revolving borrowing base $40 million would have lessened that fee.

especially when that share was the smallest; or how Citibank could be charged with any unfairness when nothing shows that it drafted the joint-venture agreement.

As for JSCNI's other arguments, the evidence on which it relies shows the following. In Phase III, Citibank would not issue any letters of credit without cash or government securities as collateral to back them. Kermath opined that the "transaction was structured to avoid [Citibank's] taking any kind of . . . trade finance risk." Roberts opined that "on a deal like this we weren't going to take any credit risk other than fully backed by cash and marketable securities" and that Citibank "was never interested in underwriting . . . credit, against any kind of foreign assets or cash flows" because of the risks in Russia. Similarly, an internal Citibank memorandum supporting the credit-approval request recited that JSCNI would "essentially be prepaying a large part of the equipment purchase," a financing term that "[Citibank] and TPS negotiated . . . to reduce TPS/Santos family risk in the transaction." The same internal memorandum indicated:

> The current structure resembles "typical" trade finance transactions with a domestic company selling manufacturing equipment cross-border. The equipment is then used to produce a product to be sold to off-shore buyers. The proposed transaction differs from "traditional" trade finance deals in the fact that this transaction will be 100 percent secured by Treasury and short-term Government obligations (in New York) whereas "typical" trade finance transaction [sic] are reliant on cash flows from the subject equipment for repayment/collateral.

Robert Lynch, Citibank's Senior Managing Director for Credit and Banking Services in 1997, opined that the great majority of transactions that Citibank financed did not employ this full-cash-collateral requirement, but instead employed marketable securities, real estate, and business assets as collateral—although he explained that Citibank had used the full-cash-collateral requirement before. The Phase III contracts, as had those in Phase II, undisputably provided for fees to Citibank and TPS upon and after the transaction's closing. Had the Phase III deal gone through, Citibank would have earned hundreds of thousands of dollars in fees for collateral management and issuance of letters of credit, and TPS would have earned its Transaction Fee and a success fee that it would have split with Citibank. As for fees payable before closing, Abji estimated that Citibank was paid $50,000 for its structuring and advising on the project.

This evidence must nonetheless be understood in the context of undisputed background evidence, especially because it concerns a highly complex and lengthy transaction and Citibank's intent and knowledge. *See City of Keller,* 168 S.W.3d at 811, 817–18. First, the evidence undisputably demonstrated the financial risk in conducting business in Russia at this time: retroactive application of tax laws that had already resulted in asset seizures; several devaluations of the ruble in the 1990s, which would result in 1998 alone in a loss to New Neftegas of about $200,000 in accounts; periodic high interest rates and inflation since 1991; and a newly emerging free-market system. JSCNI was not licensed to hold funds in its name outside Russia, and its funds held in accounts in Russia had already been seized once in January 1997. Old Neftegas had gone bankrupt in 1997, at a time when it had about $25 million in loans outstanding, and New Neftegas had no activity until 1997. Furthermore, as JSCNI has consistently observed here and below, TPS had a nega-

tive net worth. Citibank also recognized this fact because the same internal Citibank documents on which JSCNI relies in support of its issue one discuss TPS's negative net worth, its having no financial capacity outside of the transaction, and the resultant "specter of insolvency and possible fraudulent conveyance claims" involving TPS (this being the stated reason for the $500,000–net–worth and 1:1–asset–liability–ratio conditions precedent to financing). It was also undisputed that there was no Exim guarantee at Phase III. Additionally, Citibank documents revealed that the Santos family had expressly declined, for the first time in the transaction, to be guarantors in Phase III. Citibank's identified "way out" in case of default was solely the liquidation of collateral—not the transaction's success, not TPS's net worth (because it had none), and not recourse to the Santos family (because that family would no longer guarantee financing). Additionally, it was undisputed that Avanti required letters of credit from a prime bank and would not accept other forms of payment. The credit facility at all stages enabled the various Neftegas entities to comply with this aspect of their contract with Avanti. Furthermore, JSCNI does not complain on appeal that similar Citibank fees to which it agreed in Phase II were unfair, nor does it argue here that the Phase II credit facility that limited issuance of letters of credit to the amount of collateral in the form of funds, securities, and instruments—so as fully to protect Citibank upon issuance of the letters of credit—was unfair. Finally, the leasing and joint-venture structures that Citibank established in Phase III allowed JSCNI and TPS to avoid heavy VAT, excise tax, and import tariffs.

No one contests the jury's finding that Citibank was not JSCNI's agent and thus did not breach a fiduciary duty directly to it. What JSCNI had to show, then, was that Citibank *intentionally* aided TPS in what it *knew* was a breach of the latter's own fiduciary duty. Against the above, undisputed backdrop, JSCNI did not show this. It is clear that Phase III's financing was structured to avoid risk to Citibank, to reduce risk to TPS and the Santos family, and to require high quality collateral, which was unusual but not unprecedented. But the record also indicates that TPS had no net worth and was a financial risk, no Exim bank guarantee or Santos family collateral was available, and the Russian economy and taxation system were risky at the time. It is also clear that Citibank structured Phase III as a lease under which the guarantors' payments became TPS's property, for pledge to Citibank as collateral. But the record again explains why this was so: JSCNI could not hold collateral in accounts under its name outside Russia (as had been contemplated in Phase II), its funds held inside Russia were subject to a risky economy and taxation system, and a leasing and joint-venture structure prevented high VAT, excise tax, and import tariffs that would have increased the project's cost significantly. Against the undisputed backdrop, Citibank's cited actions are no evidence that it knew that structuring Phase III in the way that it did assisted TPS in violating any duty that it had to JSCNI. Moreover, some of the pre-closing fees that Citibank received arose in phases predating Phase III, about which phases JSCNI does not complain, and Citibank could not have received any fees contingent upon the Phase III's success because the deal failed. Finally, JSCNI makes no complaint of the requirement from Phase II that issuance of letters of credit be fully backed by high-quality collateral (cash, securities, and instruments), a term very similar to the full-cash-collateral requirement of Phase III about which JSCNI does complain.

## C. Conclusion

We hold that the trial court did not err in rendering JNOV on JSCNI's claim that Citibank knowingly participated in TPS's breach of fiduciary duty. We overrule JSCNI's issue one.

## Civil Conspiracy

In its issue two, JSCNI asserts that the trial court erred in disregarding the jury's finding that Citibank was part of a civil conspiracy because legally sufficient evidence exists in support of this claim. Specifically, JSCNI contends that Citibank conspired with TPS on two matters: (1) acquiring the $550,000 security deposit to divert to their own uses and (2) "procuring payment of fees and expenses while concealing important information from [JSCNI] in order to structure a transaction that [was] risk-free, but extremely lucrative, for Citibank and TPS," i.e., they structured the transaction unfairly at Phase III.

## A. The Charge, Verdict, and Motion

The trial court charged the jury as follows:

> If you answered "yes" to Question No. 1 or Question No. 10,[29] then answer the following Question. Otherwise, do not answer the following Question.
>
> QUESTION NO. 19
>
> Was Citibank part of a conspiracy with TPS that damaged [JSCNI]?
>
> To be part of a conspiracy, Citibank and TPS must have had knowledge of, agreed to, and intended a common objective or course of action that resulted in damages to [JSCNI]. One

or more persons or entities involved in the conspiracy must have performed some act or acts to further the conspiracy.

The jury answered in the affirmative.

Citibank moved for JNOV on the jury's answer to Jury Question No. 19, arguing that there was no evidence of any of the elements.

## B. The Law

■■■■ " 'Civil conspiracy is a derivative action premised on an underlying tort.' " *Gary E. Patterson & Assocs., P.C. v. Holub*, 264 S.W.3d 180, 204 (Tex.App.-Houston [1st Dist.] 2008, pet. denied) (citing *Gonzales v. Am. Title Co. of Houston*, 104 S.W.3d 588, 594 (Tex.App.-Houston [1st Dist.] 2003, pet. denied)). "The required elements of a civil conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." *Id.* A " 'civil conspiracy requires specific intent' to agree 'to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.' " *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex.1996) (quoting *Triplex Communications, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex.1995)).

## C. The Acquisition and Use of the $550,000 Security Deposit

■■■ The same evidence discussed above with respect to the fraud theory based on Kermath's misrepresentations of the $550,000's use supports the elements of a civil conspiracy. For example, both TPS

---

**29.** Jury Question No. 1 asked if TPS committed fraud against JSCNI. Jury Question No. 10 asked if TPS breached its fiduciary duty to JSCNI. The jury answered "yes" to both predicate questions. No one challenges on appeal the jury's answers to those predicate questions, although the parties do address in this challenge whether one of the means of committing a breach of fiduciary duty on which the jury was instructed (unfairness of the transaction) was supported by the evidence.

and Kermath represented before the $550,000 was paid that it was a security deposit, and the jury could rationally have believed that this meant that it would be treated as any other security deposit under the Phase III contracts. Internal Citibank documents support an inference that Kermath intended to use these funds in ways other than this and that he had discussed the payment of Citibank's legal fees with TPS. The use of the funds benefitted both TPS and its representatives and Citibank and its major client. Furthermore, the funds' use was not in accordance with the Phase III contract's terms for use of security deposits. Against this backdrop, the jury rationally could have viewed TPS's and Citibank's accusing the other of having decided or instructed how the funds would be used as evidence that both parties had conspired to use the funds in ways beneficial to them both, only to point the finger at the other party when the deal fell through. That is, from this evidence, a rational jury could have discerned a meeting of the minds between Citibank and TPS to obtain the $550,000 for use in ways contrary to their representations and contrary to the Phase III contracts' terms, *i.e.*, to harm JSCNI by the funds' use, so that they would be reimbursed with JSCNI's money for expenses that were not then allowed.

## D. The Structure of the Transaction at Phase III

■■■ JSCNI relies on the very same evidence in support of this theory of conspiracy as it did in support of its knowing-participation claim. We have already held that that evidence is insufficient to support a claim for knowing participation in TPS's breach of fiduciary duty. For the same reasons as stated in that discussion, we hold that the trial court properly rendered judgment on this theory of civil conspiracy.

## E. Conclusion

We hold that the trial court erred in granting JNOV on the jury's answer to Jury Question No. 19, but only to the extent of fraud liability based on the $550,000 security deposit. We hold that the trial court did not err in granting JNOV on the jury's answer to Jury Question No. 19 to the extent that it was based on TPS's breach of fiduciary duty. We sustain in part and overrule in part JSCNI's issue two.

### Exemplary Damages

In issue three, JSCNI contends that the trial court erred in rendering JNOV on the jury's finding of exemplary damages against Citibank.

## A. The Law

Section 41.003 of the Texas Civil Practice and Remedies Code allows for the award of exemplary damages if the claimant proves by clear and convincing evidence that the harm with respect to which he seeks recovery resulted from, among other things, fraud. TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a)(1) (Vernon 2008). " 'Clear and convincing' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 41.001(2) (Vernon 2008).

■■■ In conducting a legal-sufficiency review of a jury finding made on clear and convincing evidence, we employ an elevated standard of review:

In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. . . .

If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient.

*Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 627 (Tex.2004) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex.2002)) (considering legal-sufficiency review of jury finding of malice made upon clear and convincing evidence). "This intermediate standard falls between the preponderance standard of civil proceedings and the reasonable doubt standard of criminal proceedings." *Citizens Nat'l Bank v. Allen Rae Invs.*, 142 S.W.3d 459, 483 (Tex.App.-Fort Worth 2004, no pet.).

" 'To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so.' " *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex.2009) (quoting *In re J.F.C.*, 96 S.W.3d at 266). " 'A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.' " *Id.* " 'This does not mean that a court must disregard all evidence that does not support the finding.' " *Id.* "Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence." *Id.; see also City of Keller*, 168 S.W.3d at 817 ("[W]e have held that a legal sufficiency review must consider *all* the evidence (not just that favoring the verdict) in reviewing cases of ... punitive damages. In such cases, again, evidence contrary to a verdict cannot be disregarded.") (emphasis in original).

## B. The Charge, Verdict, and Motions

The jury was charged:

If you answered "yes" to Question No. 5,[30] then answer the following Question. Otherwise do not answer the following Question.

### QUESTION NO. 6

What sum of money, if any, if paid now in cash, should be assessed against Citibank and awarded to [JSCNI] as exemplary damages, if any, for the conduct [sic] found in response to Question No. 5?

You are instructed that "exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

. . . .

The jury awarded $2.25 million in response to this question.

JSCNI moved for entry of judgment on the exemplary-damage award, seeking $270,000—twice the amount of actual fraud damages awarded against Citibank—so as to comply with the statutory cap. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.008(b)(1) (Vernon 2008). Citibank moved for JNOV on the jury's answers to both Jury Question Nos. 5 and 6 on the basis that there was no evidence of fraud or, alternatively, any evidence of fraud did not meet the clear-and-convincing burden of proof. The

---

**30.** Jury Question No. 5 asked if the jury found by clear and convincing evidence that the harm to JSCNI resulted from fraud. "Clear and convincing evidence" was defined as "the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established." Jury Question No. 5 was predicated on an affirmative answer to Jury Question No. 2, which asked if Citibank had committed fraud against JSCNI. The jury answered "yes" to both of these predicate questions.

trial court granted Citibank's JNOV motion on the jury's award of exemplary damages.

## C. Discussion

 We have already discussed in detail the evidence supporting the jury's finding of fraud under the theory that Citibank misrepresented the $550,000's use as a security deposit, concluding that there was some evidence more than a scintilla to support this theory of fraud.[31] This holding was made pursuant to the review standard for findings proved by a preponderance of the evidence, under which standard "any evidence that does not merely create surmise or suspicion can be used to show that something is more likely than not." *Garza*, 164 S.W.3d at 621. "But when proof of an allegation must be clear and convincing, even evidence that does more than raise surmise and suspicion will not suffice unless it is capable of producing a firm belief or conviction that the allegation is true." *Id.* "Evidence of lesser quality is, in legal effect, no evidence." *Id.* To be entitled to exemplary damages, JSCNI had the burden of showing by *clear and convincing* evidence that, among other things, Kermath intended to defraud JSCNI *at the time* that he solicited the $550,000 as a security deposit. Although the circumstantial evidence viewed in the light most favorable to JSCNI that we discussed above constitutes more than a scintilla of evidence that Kermath intended to defraud JSCNI at the time of his representations, it simply is not capable of producing a firm belief or conviction of that intent. *Compare, e.g., Mustafa v. Matrut*, No. 01–08–00985–CV, 2010 WL 1492419, at *10 (Tex.App.-Houston [1st Dist.] Apr. 15, 2010, no pet.) (memo.op.) (upholding clear and convincing evidence of fraudulent intent not to perform in future when defendant repeatedly promised to repay plaintiff, wrote checks for which funds were insufficient, moved funds among accounts to ensure insufficient funding for checks, did not use line of credit to pay checks despite having done so with other parties in past, and changed trial testimony when confronted with inconsistencies); *Citizens Nat'l Bank*, 142 S.W.3d at 483 (upholding finding of clear and convincing evidence of fraudulent nondisclosures based on much more extensive circumstantial evidence); *Gibson v. Fauber*, No. 12–02–00249–CV, 2004 WL 2002560, at *9–10 (Tex.App.-Tyler Sept. 8, 2004, pet. denied) (memo.op.) (same, regarding fraudulent intent to induce plaintiff into payment).

We hold that the trial court properly granted Citibank's JNOV motion on the jury's exemplary damages finding. We thus overrule JSCNI's issue three.

## Joint and Several Liability for Interest

[38] On rehearing, JSCNI argues that when we modified the judgment to incorporate the jury's civil conspiracy finding, we should have made Citibank jointly and severally liable both for the fraud damages awarded against TPS (which we did) and for the pre-judgment interest awarded against TPS on those damages (which we did not). Although JSCNI did not expressly mention in its opening brief that it sought joint and several liability on this pre-judgment interest, we conclude that such a request was implicit in its challenge to reverse the JNOV rendered on its con-

---

31. We have also already sustained Citibank's legal-sufficiency challenges to the other fraud theories on which JSCNI relies on appeal— (1) that Kermath falsely stated that the transaction was complete after the negotiation of the scheduled amounts of security deposit at the August 15, 1997 closing and (2) that Citibank failed to disclose material information that made earlier representations misleading or untrue. These fraud theories thus cannot support the award of exemplary damages.

spiracy claim. *See Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989) (instructing liberal construction of appellate challenges in order to obtain just, fair, and equitable adjudication of litigants' rights); *see also* TEX.R.APP. P. 38.1(f), 38.9. We thus modify the judgment to make Citibank jointly and severally liable for this one pre-judgment-interest award.

We distinguish two of the cases on which Citibank relies to argue that JSCNI's prejudgment interest requests comes too late because, in them, pre-judgment interest was not requested in the trial court. *See S. Pac. Transp. Co. v. Luna*, 730 S.W.2d 36, 40 (Tex.App.-Corpus Christi 1987) (prejudgment interest not requested until remand from Texas Supreme Court), *rev'd on other grounds*, 724 S.W.2d 383 (Tex. 1987); *Houston Lighting & Pow. Co. v. Reynolds*, 712 S.W.2d 761, 773–74 (Tex. App.-Houston [1st Dist.] 1986) (op. on reh'g) (pre-judgment interest not requested until rehearing on appeal), *rev'd on other grounds*, 765 S.W.2d 784 (Tex.1988). In contrast, JSCNI asked the trial court to award this interest by motion for judgment, and the only reason that the trial court denied the request was that it rendered JNOV on the only finding that could have supported it (civil conspiracy). We also distinguish *Washington v. Walker County*—on which Citibank relies and in which this Court held that a party could not challenge the denial of a request for prejudgment interest first on rehearing—because we have already construed JSCNI to have raised this issue implicitly in its opening brief. *See* 708 S.W.2d 493, 497 (Tex.App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.). Moreover, Walker failed to brief his entitlement to pre-judgment interest in the first instance, whereas here, JSCNI briefed its challenge concerning conspiracy, which had as its natural consequence joint and several liability both for damages and pre-judgment interest, which JSCNI had requested below.

Finally, JSCNI also argues on rehearing that we should further modify the judgment to recite expressly Citibank's joint and several liability for any post-judgment interest for which TPS is liable. We deny this request because the trial court adopted in its judgment the very post-judgment-interest provision that JSCNI proposed, and that its motion for entry of judgment requested, which did not expressly recite that liability for this interest would be joint and several.

## Conclusion

Based on our holding that the trial court erred in granting JNOV on the jury's finding that Citibank conspired with TPS to defraud JSCNI of its $550,000 security deposit, we modify the trial court's judgment to provide that, based on that jury finding, Citibank be jointly and severally liable with TPS for (1) the $315,000 actual damages awarded against TPS for TPS's fraud and (2) the $244,744.50 in prejudgment interest awarded against TPS on the those fraud damages. We affirm the judgment as so modified.

Justice SHARP, dissenting. Dissent to follow.

JIM SHARP, Justice, dissenting.

I join the panel's opinion except for those portions affirming the judgment notwithstanding the verdict ("JNOV") on JSCNI's (1) request for exemplary damages and (2) claims based on the unfair structure of Phase III, specifically, those for conspiracy and knowing participation in breach of fiduciary duty. To the extent that the Court's judgment is based upon these portions of the opinion, I respectfully dissent.

## A. Exemplary Damages

The majority opinion thoroughly discusses the evidence supporting the jury's

finding of fraud under the theory that Citibank misrepresented the $550,000's use as a security deposit—evidence showing, for example, Kermath's representations to JSCNI that the funds would be held as any other security deposit, his communications to others before and after those representations instructing that the funds be used differently, and his advice that TPS use the funds to benefit Citibank and its important client. I agree with our holding that the cited evidence was some evidence to support this theory of fraud under a preponderance-of-the-evidence burden.

But unlike the majority, I would further hold that this same evidence was also sufficient for a reasonable trier of fact to have formed a firm belief or conviction that fraud had occurred—including that Kermath intended at the time of his representations that at least some of the $550,000 would not be used as he said.

The jury could simply have disbelieved Kermath's and the TPS representatives' stated belief, which was contradicted by other credible evidence or the Phase III contracts themselves, that their actions comported with the Phase III contracts. For the same reasons, the jury could also have discredited Kermath's testimony that he never advised TPS how to use the funds or discussed the security-deposit schedules at the August 15 closing.[1] The jury's abili-

ty to believe or to disbelieve any witness does not evaporate just because the burden of proof is heightened. *See In re J.F.C.*, 96 S.W.3d 256, 264 (Tex.2002) (noting that, even under heightened standard of review, "[A] court should disregard all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible.").

Neither does the jury's ability to draw reasonable inferences from the evidence evaporate. *See City of Keller v. Wilson*, 168 S.W.3d 802, 821 (Tex.2005) ("Even if the evidence is undisputed, it is the province of the jury to draw from it whatever inferences they wish, so long as more than one is possible and the jury must not simply guess."); *In re T.N.*, 180 S.W.3d 376, 382 (Tex.App.-Amarillo 2005, no pet.) (concerning appellate review of judgment rendered on clear-and-convincing proof, providing, "The reviewing court must recall that the trier of fact has the authority to weigh the evidence, draw reasonable inferences therefrom, and choose between conflicting inferences."). The evidence here—whether disputed or not—allows for several reasonable inferences concerning Kermath's intent, e.g., (1) intent to defraud extant at the time of his representations, (2) intent to defraud arising later, and (3) mistake and no intent to defraud at any time. The inference that the jury drew here was one of those, and the evidence underlying it, albeit circumstantial, was sufficient for a reasonable trier of fact to

---

1. For example, three witnesses directly contradicted Kermath's testimony that he did not discuss the security-deposit schedules at the August 15 closing. Moreover, even if the jury could not reasonably have believed these witnesses' testimony that Kermath agreed at the August 15 closing to the minimum security-deposit *schedule* memorialized by Abji's August 27, 1997 letter—because, for example, such a schedule would have delayed collateral build-up under the full-cash-collateral requirement that Kermath consistently advised TPS was needed—the jury could nonetheless

have believed their testimony that Kermath represented that the $550,000 was a *security deposit*, as an internal Citibank document described it and as Kermath indicated by the Commitment Letter's later reference to the funds' placement in an Investment Account. The jury could furthermore have reasonably believed Abji's and Karber's testimony that Kermath advised them on how to use the $550,000, including in ways that the Phase III contracts did not then allow, for the benefit of Citibank and its important client, and discredited Kermath's contrary testimony.

have formed a firm belief or conviction of Kermath's fraudulent intent. *See Hubicki v. Festina,* 156 S.W.3d 897, 904 (Tex.App.-Dallas 2005) (under heightened standard of review, holding that sufficient evidence supported fraud finding underlying exemplary damages award when finding was based on circumstantial evidence that defendant intended not to perform at time of representation: testimony was that plaintiff believed that defendant never intended to fulfill promise based on long-standing relationship between parties, plaintiff's knowledge of defendant's business practices, and statements made by defendant when refusing to fulfill promise), *rev'd on other grounds,* 226 S.W.3d 405 (Tex.2007). As the *Hubicki* court noted in holding that the circumstantial evidence in that case met the clear-and-convincing burden, fraudulent intent is virtually always proved by circumstantial evidence because it simply is not susceptible to direct proof. *Id.; see Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435 (Tex.1986) ("Since intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence."). If the circumstantial evidence in *Hubicki* sufficed, then I fail to see why the evidence produced here does not.

For these reasons, I would hold that that the same evidence supporting the fraud-liability finding was also sufficient for the jury to form a firm belief or conviction that fraud had occurred. I would thus further hold that the trial court erred in granting Citibank's JNOV motion on the jury's exemplary damages finding. To the extent that the majority's judgment does not do so, I respectfully dissent.

## B. Civil Conspiracy and Knowing Participation in Breach of Fiduciary Duty Based on Unfairness of Phase III's Structure

I further dissent from the majority's judgment to the extent that it affirms the JNOV rendered on JSCNI's claims that were predicated upon the unfairness of Phase III's structure to JSCNI: civil conspiracy and knowing participation in breach of fiduciary duty.

What the evidence viewed in the light most favorable to JSCNI showed is that Citibank and TPS were taking almost no risk—except the "risk" of not making hundreds of thousands of dollars in fees if the deal failed to close—in financing the Project. Citibank's own words are the best evidence of its intent: in its internal documents, Citibank admitted that TPS and Citibank negotiated the unusual term that JSCNI would "prepay[ ] a large part of the equipment purchase" (i.e., the full-cash-collateral requirement) exactly because they sought "to reduce TPS/Santos family risk in the transaction."

This is important for three reasons. First, Manuel Santos was a co-owner of TPS, and the Santos family members were important Citibank clients apart from this transaction. Second, Citibank knew that TPS was JSCNI's agent for the Project and for obtaining funding, that is, Citibank should have known that TPS had a fiduciary duty to JSCNI. Third, even as they negotiated this risk-minimizing structure for themselves, TPS and Citibank knew that JSCNI and its affiliate guarantors would be the ones putting up all initial collateral for the Project, since TPS had a negative net worth at the time.

All that JSCNI had to produce in support of its claims was *some* evidence that would allow reasonable and fair-minded people to reach the verdict that these jurors did. *See City of Keller,* 168 S.W.3d at 827. This is not a high burden, and I believe the above evidence met it. First and foremost, it is some evidence that Citibank and TPS had a meeting of the

minds to establish a structure that shifted all of the risk onto JSCNI in order to minimize their own (or their important client's) risk, even though TPS was JSCNI's agent. *See Gary E. Patterson & Assocs., P.C. v. Holub,* 264 S.W.3d 180, 204 (Tex.App.-Houston [1st Dist.] 2008, pet. denied) (setting out elements of claim for civil conspiracy). It is also is some evidence that Citibank knowingly helped TPS to breach its fiduciary duty as JSCNI's agent in order to minimize Citibank's own risks in the potentially lucrative transaction. *See Kastner v. Jenkens & Gilchrist, P.C.,* 231 S.W.3d 571, 580 (Tex.App.-Dallas 2007, no pet.) (explaining liability for knowing participation in breach of another's fiduciary duty).

For these reasons, I would hold that sufficient evidence supported the jury's findings that Citibank and TPS conspired to structure a transaction that was unfair to JSCNI and that Citibank knowingly participated in TPS's breach of fiduciary duty arising from such a structuring. I would thus further hold that the trial court erred in granting Citibank's JNOV motion on the jury's affirmative answers to Jury Questions 18 and 19 and would reach Citibank's relevant cross-points. To the extent that the majority judgment on rehearing does not do so, I respectfully dissent.

Justice SHARP, dissenting in part.