# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-23-00867-CV

**Darin J. Bassett and Kimberly A. Bassett, Appellants**

**v.**

**Justin Byrn; Candace Byrn; Lauren O'Neal as the Executrix of the Estate of
Donnie C. O'Neal; Property Consultants of Austin, Inc.; and
JKB Construction Company, LLC, Appellees**

---

**FROM THE 425TH JUDICIAL DISTRICT COURT OF WILLIAMSON COUNTY
NO. 18-0504-C425, THE HONORABLE SCOTT K. FIELD, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Darin J. Bassett and Kimberly A. Bassett (collectively, "the Bassetts") appeal from the trial court's take-nothing judgment on their claims against Justin Byrn; Candace Byrn; Lauren O'Neal as Executrix of the Estate of Donnie C. O'Neal; Property Consultants of Austin, Inc. (PCA) and JKB Construction Company, LLC (JKB), arising out of the Bassetts' purchase of real property located in Williamson County (the Property). We will affirm the trial court's judgment.

### BACKGROUND

Justin Byrn originally purchased the Property in 2013. Byrn testified that the house located on the Property was "dilapidated" and "uninhabitable" and that he hired a construction company, Lecates Construction, to remodel the house. Byrn testified about the

scope of the remodel, which included replacing the floor; converting a screened-in porch into a dining room; replacing the windows; replacing the existing siding with masonry siding and rock wainscoting; replacing the roof, including installing soffits to replace tin-roof overhangs; removing an interior wall to open the kitchen area; installing new woodgrain flooring and porcelain and travertine tile; installing new cabinets, appliances, and backsplashes in the kitchen; and renovating the bathrooms. Byrn stated that his instructions to Lecates Construction were "[t]o totally remodel or repair anything that needed to be fixed in the home" and testified that he believed that Lecates Construction had complied with those instructions.

In 2017, Byrn listed the Property for sale, describing it in the Multiple Listing Service (MLS) database as:

> Beautiful Ranch style home that sits on 4.63 acres. Home has been completely remodeled from the piers up with plumbing, electrical, studs, walls and roof in 2014. All new appliances with laminate wood flooring and tiled wet areas. Lots of large oak trees throughout the property that provide lots of shade.

The "Yr Built" section of the listing stated "1960/Updated/Remodeled." On January 31, 2018, the Bassetts executed a Texas Real Estate Commission form One to Four Family Residential Contract (Resale) (the TREC Contract) to purchase the Property. The TREC Contract included a sales price of $318,000 and provided that "Buyer accepts the Property As Is." The "As Is" provision stated:

> "As is" means the present condition of the Property with any and all defects and without warranty except for the warranties of title and the warranties in this contract. Buyer's agreement to accept the Property As Is under [this paragraph] does not preclude Buyer from inspecting the property [], from negotiating repairs or treatments in a subsequent amendment, or from terminating this contract during the Option Period, if any.

2

The Bassetts retained Daniel Burke to conduct a pre-purchase inspection of the Property. The opening paragraph of Burke's report stated:

> [T]his home is older than 30 years and the home inspector considers this while inspecting. It is common to have areas that no longer comply with current code. This is not a new home and this home cannot be expected to meet current code standards.

Burke's report also cautioned of the difficulties in inspecting an older home, stating:

> It is common to see old plumbing or mixed materials. Sometimes water signs in crawlspaces or basements could be years old from a problem that no longer exists. Or, it may still need further attention and repair. Determining this can be difficult on an older home. [] Always consider hiring the appropriate expert for any repairs or further inspection.

The report included descriptions of defects in the house, including that "there are signs of fungi growth present on the floor system" in several areas and stated that the underlying cause of the fungi was moisture. The report includes a photograph of the fungi growth and states that "[t]he foundation skirting is cracked in several areas. Mortar repair is recommended to reduce water runoff entry into the crawlspace." The Burke report identifies "signs of previous leaks" into the crawlspace and includes photographs of water damage. The report also identifies numerous construction deficiencies that allowed for water penetration into walls and the attic, including missing "Z" flashing above the windows, unsealed electrical panels, and daylight visible through the roof covering material in need of repair to prevent water incursion into the attic space. The report advised the Bassetts to "have the areas further evaluated by a qualified contractor to perform exploratory [work] to determine the extent of the [water] damage."

Burke's inspection revealed that the furnace, located in the attic, was dated 1994. The data plate on the outside condenser unit was missing, but the Bassetts' real estate agent was

informed that the HVAC system had not been replaced during the remodel. The Bassetts hired other inspections of the Property, including an HVAC inspection, a septic inspection, and a mold inspection.[1]

On February 9, 2018, the Bassetts' real estate agent sent Donnie O'Neal, Byrn's agent, an email requesting a reduction of the purchase price based on defects found during the inspections. The email stated, in part:

> After all our inspections and consultations with contractors, there are several items that require attention/repair. They are included below:
>
> • Non-reinforced concrete blocks (used as piers) should be filled to meet current standards.
>
> • There are piers not tied to the beam structure of the home. Current standards require metal straps or ties be embedded in concrete piers and affixed to the beams to prevent displacement or separation between the structural components.
>
> • Remove all debris from crawl space as it attracts rodents.
>
> • There are signs of fungi growth present on the floor system in crawlspace in several areas. The underlying cause is moisture and might or might not be a health hazard. Remediation is recommended. Recommend installation of a 6 mil vapor barrier (covering exposed grade, overlap 6 inches taping seams, run 12 inches up foundation walls) to prevent moisture penetration into the wooden structural sub-floor members.
>
> • Gutter debris preventing proper drainage.
>
> • Daylight was visible through the roof covering material and in need of repair to prevent water incursion into the attic space.
>
> • [Corrugated stainless steel tubing] was observed in this home and proper bonding of this gas distribution system was unable to be verified. Due to the known safety concerns concerning this system, recommend this system be further evaluated by a qualified licensed electrician.

---

[1] The sale closed before the Bassetts received the report from the mold inspection. The mold inspection was done on February 15, 2018, and the inspector sent mold samples for testing. The Bassetts did not ask to extend the closing date to obtain the inspector's findings, and the sale closed on February 16, 2018.

The email identified additional concerns, including an ungrounded circuit in the bedroom, lack of smoke detectors, and the need to reseal the HVAC supply plenum and replace flexible gas lines in the furnace with hard pipe. The email stated: "Based on these action items and consultations with contractors and service companies, the total for these repairs is approximately $5000. My clients are asking for $3500. This amount will be taken off the sales price." Byrn agreed to the price reduction and the parties executed an amendment to the TREC Contract on February 10, 2018. The sale closed on February 16, 2018.

In April 2018, the Bassetts sued Justin Byrn alleging that Byrn had misrepresented to him "that the home on the Property was entirely new construction" and that the "the old structure had been completely torn down, that the foundation had been completely replaced and that the home on the Property was newly built in 2014/2015." The Bassetts alleged that Byrn "knew or should have known, that the home on the Property was not 'new construction'" but, despite that knowledge, misrepresented to them that it was. The Bassetts alleged that, after the sale, they discovered issues with the flooring and foundation and "also discovered signs of mold which caused them concern." The Bassetts alleged that they hired other experts to inspect the home "in order to determine whether or not [Byrn's] claims of 'new construction' were true as to other areas." The Bassetts alleged that these inspections revealed that "the home on the Property was not built to code, in need of major repairs, and not 'new construction' by any standard." Based on these allegations, the Bassetts asserted causes of action for fraud in a real estate transaction, fraud by nondisclosure, and fraud in the inducement. They also asserted claims for breach of contract and violations of the Deceptive Trade Practices-Consumer Protection Act (DTPA) and sought actual and exemplary damages.

In the following months, the Bassetts amended their petition to add as defendants Candace Byrn and the Byrns' listing agent, O'Neal, and his brokerage, Property Consultants of Austin, Inc. In 2023, the Bassetts added as a defendant Byrn's utility installation company, JKB Construction Company, L.L.C., under a "reverse piercing" theory that the construction company was vicariously liable for Byrn's actions. The Bassets continued to assert that the defendants misrepresented the condition of the home on the Property by claiming it was "new construction."

In May 2018, the Bassetts hired Josh Ressling to perform repairs and make improvements to the Property. Ressling charged the Bassetts approximately $26,000 for repairs that were principally related to damage caused by mold or some "fungal growth" that originated in the crawlspace of the house.

The Bassetts' claims against JKB Construction Company were dismissed on summary judgment, and the Bassetts did not appeal that order. The case was tried to a jury in a five-day trial. The court dismissed the Bassetts' claims against Candace Byrn on directed verdict following the Bassetts' presentation of their case in chief. The Bassetts have not appealed Candace Byrn's dismissal. The trial court also granted the remaining defendants' motion for directed verdict, made at the close of the Bassetts' case in chief, on the Bassetts' claims for breach of contract and their implied and express warranty claims. At the close of evidence, the court submitted four liability questions to the jury on common-law and statutory fraud, violation of the DTPA, and negligent misrepresentation. The jury returned "no" answers to the liability questions for Byrn and O'Neal.[2] The jury also found that the actions of the Bassetts contributed to causing their damages or injuries and attributed 50% responsibility to each of them. The court

---

[2] Because the jury failed to find O'Neal liable on any of the claims, they did not reach the question of whether PCA was liable because O'Neal was acting within the course and scope of his agency relationship with PCA.

rendered judgment on the jury's verdict, ordering that the Bassetts take nothing on their causes of action. Because the parties had stipulated to the attorneys' fees sought by Justin Byrn, Candace Byrn, and PCA, the court awarded them attorneys' fees of $225,183.30; $39,738.23; and $120,000; respectively.[3]

After the trial court denied the Bassetts' motion for judgment notwithstanding the verdict and for new trial, the Bassetts perfected this appeal. On appeal, the Bassetts assert that the trial court erred by (1) denying their motion for directed verdict, made after they presented their case in chief, on their statutory fraud claim; (2) granting defendants' motion for directed verdict on their breach of contract and DTPA claims; and (3) denying their post-judgment motions seeking to set aside the jury's failure to find Byrn or O'Neal liable for statutory fraud or violation of the DTPA. The Bassetts also complain of the trial court's failure to grant its motions to compel and for sanctions based on alleged discovery abuse and its failure to "disqualify JKB's counsel and void[] JKB's pleadings as JKB's counsel was hired without authority."

## DISCUSSION

### *Denial of the Bassetts' motion for directed verdict on their statutory fraud claim*

In their first issue, the Bassetts contend that the trial court erred by denying their motion for directed verdict on their statutory fraud claim, which was made at the close of their case-in-chief and before any of the defendants presented their case. According to basic principles of trial court procedure, a trial court should not render a directed verdict against a party before that party has had a full opportunity to present the party's case and has rested. *See Tana Oil & Gas Corp. v. McCall*, 104 S.W.3d 80, 82 (Tex. 2003); *Nassar v. Hughes*,

---

[3] The judgment did not award attorneys' fees to the Executrix of O'Neal's estate because she did not present any evidence of the estate's attorneys' fees.

7

882 S.W.2d 36, 38 (Tex. App.—Houston [1st Dist. 1994, writ denied). If a trial court renders a directed verdict against a party before that party has rested its case-in-chief, the trial court's directed verdict is reversible error absent application of an exception recognized by the supreme court. *See Tana Oil & Gas Corp.*, 104 S.W.3d at 82. In *Tana Oil*, the supreme court concluded that granting a directed verdict before the plaintiffs rested could be harmless error when, even if the plaintiffs had proved the claims, they would not have been entitled to recover because they had affirmatively limited the claims to damages they could not recover as a matter of law. *See id.* In that circumstance, the court explained, the basis for a directed verdict was unrelated to any assessment of the trial evidence. *Id.*

The Bassetts argue that the court should have directed a verdict in their favor against defendants at the close of the Bassetts' case-in-chief because "there was no evidence of probative value that raised a material fact issue concerning any of the essential elements of their claim." The basis for the request for a directed verdict was directly related to the assessment of trial evidence. Thus, this case falls within the general rule, rather than the *Tana Oil* exception. The trial court did not err by denying the motion for directed verdict and, instead, would have reversibly erred had it granted a directed verdict against the defendants before they had an opportunity to present their case. *See id.*; *Nassar*, 882 S.W.2d at 38. We overrule the Bassetts' first issue.

### *Grant of Byrn's motion for directed verdict on the Bassetts' breach of contract claim*

In their second issue, the Bassetts assert that the trial court erred by granting Byrn's motion for directed verdict on the Bassetts' breach of contract claim against him. The Bassetts maintain that a directed verdict on this claim was error because they presented evidence

8

that Byrn made "false disclosures" in a seller's disclosure notice he provided the Bassetts as required by Texas Property Code section 5.008. *See* Tex. Prop. Code § 5.008(a) (requiring seller of residential real property to provide purchaser written notice disclosing property condition in form substantially similar to form prescribed in subsection (b)). The Bassetts argue that Byrn's duty to provide a seller's disclosure notice pursuant to section 5.008 "was explicitly incorporated into the purchase contract" and that evidence that Byrn's disclosures were not truthful constituted evidence of breach of contract precluding a directed verdict. *See Daniels v. Allsup's Convenience Stores, Inc.*, 604 S.W.3d 461, 465 (Tex. App.—Amarillo 2020, pet. denied) (defendant is not entitled to directed verdict if there is probative evidence sufficient to raise fact issue on material question presented).

To support their position that Byrn had a contractual duty not to make misrepresentations on the section 5.008 disclosure notice, the Bassets point to section 7(B) of the TREC Contract, which states, in relevant part:

> 7. **PROPERTY CONDITION**
>
> . . .
>
> B. Seller's Disclosure Notice Pursuant to § 5.008 Texas Property Code (Notice):
>
> (Check one box only)
> X (1) Buyer has received the Notice.
> _(2) Buyer has not received the Notice. Within _____ days after the effective date of this contract, Seller shall deliver the Notice to Buyer. If Buyer does not receive the Notice, Buyer may terminate this contract at any time prior to the closing and the earnest money will be refunded to Buyer. If Seller delivers the Notice, Buyer may terminate this contract for any reason within 7 days after Buyer receives the Notice or prior to the closing, whichever first occurs, and the earnest money will be refunded to Buyer.

Nothing in this section of the TREC Contract obligates Byrn to do anything, nor does it impose on him a contractual duty not to make misrepresentations in the section 5.008 notice. The sole

9

function of section 7(B) is to state whether or not the buyer had received the section 5.008 notice when the parties signed the TREC Contract. In the event the Buyer had not received the notice by that time, this section simply states the legal effect—created by section 5.008 itself—which is that the buyer may terminate the contract for any reason within seven days of receiving the notice. *See* Tex. Prop. Code § 5.008(f) (providing that "if a contract is entered without the seller providing the notice [], the purchaser may terminate the contract for any reason within seven days after receiving the notice."). This section of the TREC Contract does not create any *contractual* obligation that the seller make only truthful disclosures in the section 5.008 notice. To be sure, a duty not to make fraudulent misrepresentations to induce another to enter into a contract exists under Texas common law, *see Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998) ("Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations."), but breach of that duty is actionable in tort, not contract, *see Dallas Farm Mach. Co. v. Reaves*, 307 S.W.2d 233, 239 (Tex. 1957) ("[I]t is well established that the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself."). Because the TREC Contract does not create any duties or obligations regarding the accuracy of the section 5.008 notice, evidence of untruthful disclosures in that notice cannot support a cause of action for breach of the TREC Contract. The trial court did not err in granting Byrn's motion for directed verdict on the Bassetts' breach of contract claim against him. We overrule the Bassetts' second appellate issue.

***Grant of Byrn's and O'Neal's motion for directed verdict on the Bassetts' DTPA breach of warranty claim***

In their third issue, the Bassetts assert that the trial court erred by granting Byrn's and O'Neal's motions for directed verdict on the Bassetts' DTPA breach of warranty claim against them. The Bassetts maintain that a directed verdict on this claim was error because they presented evidence that Byrn made an express warranty about the condition of the Property by advertising that the house had been "completely remodeled from the piers up" when the house did not in fact meet that standard. The Bassetts assert that evidence that O'Neal made express warranties "about the condition of the Property and the extent of the remodel," including stating in an email that the house had been "torn down to the floors" and stating that the house "had been rebuilt" when it did not in fact meet that standard preclude a directed verdict on their DTPA express warranty claim against O'Neal.

In their live pleading, the Bassetts alleged that they "have a cause of action against Defendants under the provision of the DTPA pursuant to § 17.50(a), which provides remedies for [] breach of an express or implied warranty." Byrn filed a motion for directed verdict and argued to the trial court that there was no evidence that he made any warranties to the Bassetts and, even if he had, the TREC Contract disclaimed all express and implied warranties. For the first time on appeal, the Bassetts assert that the description of the Property provided in the MLS listing as "remodeled from the piers up" constituted "affirmations of fact which relate to a sale [and] are considered express warranties."

As previously stated, the TREC Contract contained an "As Is" provision that "Buyer accepts the Property As Is." The "As Is" provision states that the Bassetts agreed to accept the Property "with any and all defects and without warranty except for the warranties of

11

title and the warranties in this contract." The alleged warranty that the Bassetts rely on was not a warranty included in the TREC Contract. Further, the terms of a typical "as is" clause disclaim the existence of any express or implied warranties. *See Welwood v. Cypress Creek Ests., Inc.*, 205 S.W.3d 722, 727 (Tex. App.—Dallas 2006, no pet.); Tex. Bus. & Com. Code § 2.316(c)(1). "By agreeing to purchase the property 'as is,' the buyer agrees to make his own assessment of the bargain and to accept the risk that he may be wrong." *Welwood*, 205 S.W.3d at 727. While a seller may not obstruct the buyer's right of inspection and still rely on an "as is" provision, the TREC Contract expressly stated that the "As Is" clause did not "preclude Buyer from inspecting the property," and the evidence at trial was undisputed that the Bassetts did have the Property inspected and that the inspection revealed many, if not all, of the issues on which the Bassetts base their claims.

Relying on *McCrea v. Cubilla Condominiums Corp., N.V.*, 685 S.W.2d 755, 757 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.), the Bassetts contend that "an express warranty is created when a seller makes an affirmation of fact or a promise to the purchaser," and therefore, an express warranty exists despite the "As Is" provision in the TREC Contract. But the Bassetts leave out an important piece of the court's holding in *McCrea*, which is that the affirmation of fact must also "warrant a conformity to the affirmation as promised." *Id.* Even if we assume that the condition of the property did not conform to the statement that the house had been "remodeled from the piers up," the MLS listing did not contain any language that could be construed to "warrant a conformity to the affirmation." Thus, the statement in the MLS listing cannot itself constitute an express warranty supporting a DTPA express warranty claim. The trial court did not err in granting Byrn's motion for directed verdict on the Bassetts' DTPA express warranty claim against him.

12

Regarding O'Neal, the same analysis demonstrates that the trial court did not err in granting directed verdict on the DTPA express warranty claim against him as well. While the Bassetts claim that O'Neal told their agent that the house had been "rebuilt" and sent an email stating that the house had been "torn down to the floors," neither of these statements, even assuming they misrepresented the condition of the property, were accompanied by statements warranting that the condition of the Property conformed to them. Because the Bassetts agreed to accept the Property "As Is" and "without warranty except for the warranties of title and the warranties in this contract," the trial court did not err in granting directed verdict in favor of O'Neal on the Bassetts' DTPA express warranty claim against him. We overrule the Bassetts' third issue.

### Trial court's denial of motion for judgment notwithstanding the verdict and motion for new trial

In their fourth issue, the Bassetts argue that the trial court should have granted their motion for judgment notwithstanding the verdict on their claims for statutory fraud and DTPA breach of warranty. We review the propriety of a trial court's ruling on a JNOV motion under a legal sufficiency standard. *Tanner v. Nationwide Mut. Fire Ins.*, 289 S.W.3d 828, 830 (Tex. 2009). When examining a legal sufficiency challenge, we review the evidence in the light most favorable to the jury finding and indulge every reasonable inference that would support it. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *Tanner*, 289 S.W.3d at 830. We uphold the jury's finding if more than a scintilla of competent evidence supports it. *Id.* The final test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of*

*Keller*, 168 S.W.3d at 827. We review de novo a trial court's ruling on a motion for JNOV. *Abel v. Alexander Oil Co.*, 474 S.W.3d 795, 799 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

A party with the burden of proof at trial is entitled to a JNOV on a particular issue only if the evidence establishes that issue in their favor as a matter of law. *See Henry v. Masson*, 333 S.W.3d 825, 849 (Tex. App.—Houston [1st Dist.] 2010, no pet.). To be entitled to a JNOV, the Bassetts had the burden to prove their claims that Byrn and O'Neal committed statutory fraud and breach of warranty under the DTPA as a matter of law. *See International Bus. Machs. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 234-35 (Tex. 2019). Both causes of action share a common element—justifiable reliance—and the charge submitted to the jury instructed them that "[a] party's reliance on a misrepresentation or failure to disclose must be justified." Thus, to be entitled to a motion for JNOV, the Bassetts must demonstrate that there is no evidence that could support a jury's determination that their reliance on the allegedly false representations was not justifiable.

A party's reliance on a representation is not justified when the party had actual knowledge of the representation's falsity at the time of the alleged reliance. *See, e.g., JSC Neftegas-Impex v. Citibank, N.A.*, 365 S.W.3d 387, 407-09 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). The basis for the Bassetts' fraud and DTPA claims are their assertions that Byrn and O'Neal represented that the house was "new construction" when they knew it was not and concealed or failed to disclose construction defects that permitted water and moisture penetration causing mold. The Bassetts also argued that Byrn and O'Neal failed to disclose numerous instances of the house's construction not meeting code requirements and its needing major repairs. There was ample evidence presented at trial, including Burke's inspection report and his testimony at trial, that the Bassetts were aware that any representations by Byrn

14

or O'Neal that the house was "new construction," code compliant, and free of any defects were false and, consequently, the Bassetts could not justifiably have relied on any such representations. Burke's report alone constitutes evidence from which a jury could reasonably find that the Bassetts' reliance on the alleged misrepresentations was not justified. The report expressly states that the house was more than thirty years old and should not be expected to meet current code requirements. Burke's report identified issues with moisture penetration and advised them to hire a mold inspector to investigate fungi growth and the possibility of it being present in inaccessible areas of the house. Burke advised the Bassetts to hire a qualified contractor to evaluate signs of previous leaks and damage and repairs to the subfloors, and to perform exploratory work to determine the extent of the damage. Ressling testified that most, if not all, of the repairs he performed were related to damage caused by water penetration in the subfloor that had been documented by Burke in his report. Regarding the repairs he made, Ressling stated that "the whole point was to reduce the moisture that Mr. Burke has called out in his report to reduce mold buildup." Burke's report also identified evidence of leaks on the underside of the roof deck and the attic floor and noted that "daylight was visible through the roof covering material and in need of repair" to prevent further water incursion into the attic space.

Burke's report also identified other construction defects contributing to water penetration, including the lack of metal flashing around bedroom windows and noted "'Z' metal flashing missing over exterior doorways and windows," which the report explained would have provided a water barrier and prevented moisture intrusion into wall spaces. Burke advised that, because it was difficult to retrofit "Z" flashing, the Bassetts should regularly apply sealant to the topside of the windows to prevent water penetration. Ressling testified that he and the Bassetts

15

had a conversation before he started his work on the house in which the Bassetts mentioned a concern about mold growth in the crawl space, which he assumed they had learned about from the Burke report since "it's called out in the Burke report."

Burke's report also identified deficiencies with the foundation, stating that it was constructed with "non-reinforced concrete blocks (used as piers)," and recommended corrective action including filling the concrete blocks with cement to make them safe for load bearing. Burke's report also warned that the piers were not tied to the beam structure of the home and recommended embedding metal straps or ties in the concrete piers to affix them to the beams and "prevent displacement and separation between the structural components." Burke stated that the lack of ties could "contribute to differential settlement throughout the house." The report also identified the lack of "cross bracing" between joists "as would be found in current era structures."

Based on the information included in Burke's report, the Bassetts requested, and received, a decrease in the purchase price. There was more than a scintilla of competent evidence to support a jury's finding that the Bassetts' reliance on the alleged misrepresentations about the condition of the house was not justified. The trial court did not err in denying the motion for JNOV.

The Bassetts also filed a motion for new trial, challenging the legal sufficiency of the evidence supporting the jury's verdict. As set forth above, there was legally sufficient evidence presented at trial to support the jury's determination that the Bassetts' reliance on the alleged misrepresentations about the condition of the house on the Property was not justifiable.

The trial court did not err in denying the motion for new trial.[4] We overrule the Bassetts' fourth issue.

### *Trial court's discovery rulings*

In their fifth issue, the Bassetts contend that the trial court erred in denying a motion to compel Byrn and JKB to produce "the evidence in their possession related to the remodel," claiming, without further explanation, that "it was material to [their] claims." The Bassetts claim that there was conflicting evidence as to whether Lecates Construction was the entity that performed the remodeling work on the house and that the trial court abused its discretion by not compelling JKB "to produce the evidence in their possession that could show whether the Lecates [Construction] invoices actually represented money spent on the remodel." But the Bassetts wholly fail to explain how the identity of the entity that performed the remodel on the house on the Property or the amount spent on the remodel is material, or even relevant, to their causes of action based on alleged misrepresentations about the condition of the house. *See Stewart v. Lexicon Genetics, Inc.*, 279 S.W.3d 364, 373 (Tex. App.—Beaumont 2009, pet. denied) (holding that appellants failed to show abuse of discretion in denying motion to compel production of documents when appellants failed to explain how requested information related to issues in their suit). The Bassetts have also inadequately briefed this issue by failing to provide any argument or authority in support of their assertion that the trial court's ruling was an abuse of discretion. *See* Tex. R. App. P. 38.1(i).

---

[4] To the extent the Bassetts' appellate briefing asserts that the trial court should have granted a motion for new trial based on factual insufficiency of the evidence, because the motion for new trial did not include a factual sufficiency challenge, the Bassets have not preserved a factual sufficiency challenge for appellate review. *See* Tex. R. App. P. 33.1(a).

The Bassetts also assert that JKB was the "only entity with evidence" to "prove or disprove" Byrn's testimony regarding Lecates Construction's involvement in the remodel, the cost of the remodel, or Byrn's own knowledge of the remodel. But there is nothing in the record to indicate that JKB failed to produce evidence responsive to any discovery request related to the work Lecates Construction performed on the house. Neither Byrn nor JKB objected to that discovery; instead, Byrn agreed to, and did, produce "any contracts or correspondence with any third party providing material or labor during 2014 and 2015" and confirmed in a pre-trial declaration that the documents he produced were all he had related to the remodel. Byrn produced in discovery documents showing what he claimed to have paid Lecates Construction for the remodel. The Bassetts' briefing suggests that they doubt the veracity of those documents. However, the Bassetts themselves entered those documents into evidence at trial. And the Bassetts could have, but did not, subpoena documents from Lecates Construction, whose owner's contact information was provided in Byrn's initial disclosures. At a pre-trial hearing, the Bassetts' counsel confirmed that he had spoken to the owner and his counsel but that he had not sought his deposition. The trial court could reasonably have determined that, rather than compel Byrn and JKB to produce additional documents that they had already attested they did not have, the Bassetts could seek that information from Lecates Construction. We conclude that the Bassetts have not demonstrated that the trial court abused its discretion by denying their motion to compel.

In their fifth issue, the Bassetts also claim that the trial court should have granted a motion for sanctions and "enter[ed] a finding that the testimony of [two witnesses] would have been unfavorable to [Byrn]." The Bassetts assert that the basis of their motion for sanctions was Byrn's "deliberate concealment of their testimony." Although it is not clear from the briefing

18

how the denial of the motion for sanctions constitutes reversible error, the relief they request in the concluding paragraph of their brief related to this issue is that this Court "direct the Trial Court to give the future jury an instruction that [the two witnesses' testimony] would have been beneficial to [the Bassetts'] claims." Because we are affirming the trial court's judgment, there will be no "future jury" to instruct. Additionally, to the extent the Bassetts' issue can be construed as a complaint that the trial court erred by failing to give the jury a spoliation instruction, their brief fails to provide citations to authorities governing requests for spoliation instructions. *See id*. Nor do the Bassetts explain how Byrn could spoliate witness testimony other than to state that Byrn did not disclose the identities of the two witnesses, Abelino Maldonado and Fermin Sanchez. The record reflects, however, that in a March 2019 deposition Byrn identified these two individuals as "the two laborers that did pier work underneath the house" and, subsequently, Byrn supplemented his initial disclosures to provide the limited contact information he had for these two individuals. The Bassetts have failed to demonstrate that spoliation of evidence occurred or, if it did, that the spoliation was intentional. *See Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 14, 23 (Tex. 2014) (to receive spoliation instruction, trial court must determine whether party spoliated evidence and, if so, whether spoliation was intentional). We overrule the Bassetts' fifth issue.

### *Failure to disqualify Byrn's counsel*

In their sixth issue, the Bassetts assert that the trial court should have granted their motion to disqualify JKB's counsel on the ground that he "was hired without authority" and, consequently, the court should have struck all pleadings filed by JKB's attorney. *See* Tex. R. Civ. P. 12. Rule 12 of the Texas Rules of Civil Procedure is the exclusive method for

19

questioning the authority of an attorney to represent a party. *Angelina County v. McFarland*, 374 S.W.2d 417, 423 (Tex. 1964). Rule 12 provides that "[a]ny party in a suit or proceeding in a court of this state may, by *sworn* written motion stating that he believes the suit or proceeding being prosecuted or defended is being prosecuted or defended without authority, cause the attorney to be cited to appear before the court and show his authority to act." Tex. R. Civ. P. 12 (emphasis added). The Bassetts' motion was not sworn. The trial court did not abuse its discretion in denying an unsworn Rule 12 motion. *See Fulcher v. Texas State Bd. of Pub. Acct.*, 571 S.W.2d 366, 371 (Tex. App.—Corpus Christi 1978, writ ref'd n.r.e.) (affirming trial court's denial of motion to show authority in part because "[the] motion was not sworn to"). Moreover, JKB's attorney met his burden of demonstrating that he had authority to act on JKB's behalf. *See Patton Children's Tr. v. Hamlin*, No. 07-07-0488-CV, 2008 WL 3863475, at *4 (Tex. App.—Amarillo Aug. 20, 2008, no pet.) (mem. op.) (challenged attorney satisfies burden to show authority if he produces affidavit or testimony from his client indicating he was retained to provide representation in case). Here, JKB submitted the declaration of Byrn and Byrn's father stating that Byrn has owned 100% of the company's membership interests in JKB since January 2022. After the Bassetts amended their petition in 2023 to assert claims against JKB, Byrn, as JKB's president, executed a fee agreement with Blazier, Christensen, Browder & Virr, P.C. to represent JKB in the litigation. Thus, JKB and its attorney presented evidence supporting the trial court's determination that the Blazier firm had the authority to represent JKB, and the trial court did not abuse its discretion in crediting that evidence and denying the Bassetts' Rule 12 motion. We overrule the Bassetts' sixth issue.

20

**CONCLUSION**

Having overruled each of the Bassetts' appellate issues, we affirm the trial court's judgment, rendered on the jury's verdict, that the Bassetts take nothing by their causes of action.

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed:   November 25, 2025